**Kyle J. KELLY, Respondent,**

v.

**BASS PRO OUTDOOR WORLD, LLC, Appellant.**

No. ED 88392.

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 18, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 2008.

Application for Transfer Denied March 18, 2008.

Mark G. Arnold, St. Louis, MO, for Appellant.

Ransom A. Ellis III, Laura J. Johnson, Springfield, Robert J. Thomeczek, St. Louis, MO, for Respondent.

## OPINION

GEORGE W. DRAPER III, Judge.

Bass Pro Outdoor World, L.L.C., (hereinafter, "Bass Pro") appeals from the trial court's judgment entered after a jury returned a verdict in favor of Kyle J. Kelly (hereinafter, "Kelly") on his claim for wrongful termination. The jury awarded Kelly actual damages in the amount of $4,300.00 and punitive damages in the amount of $2.8 million. We affirm in part, reverse and remand in part.[1]

---

1. Kelly's motion to strike Bass Pro's brief for alleged Rule 84.04(c) violations, which was taken with the case, is denied.

The facts, taken in the light most favorable to the verdict, are as follows: Bass Pro operates a sporting goods and outdoor equipment retail store in St. Charles, Missouri. Bass Pro leases the property from Greater Missouri Builders, who also owns the parking lot surrounding the Bass Pro retail store. Bass Pro is permitted to section off portions of the parking lot surrounding the store for special events or to display certain products. Bass Pro monitors the parking lot via security cameras which relay images to a closed circuit television inside Bass Pro's store.

In August 2001, Bass Pro hired Kelly as a loss prevention agent. Loss prevention agents monitor the closed circuit televisions, conduct investigations, and participate in the apprehension of alleged shoplifters. Prior to working at Bass Pro, Kelly graduated from the police academy, was certified as a law enforcement officer, and had taken six to nine hours of criminal justice courses. Karl Ritter (hereinafter, "Ritter") was hired in late 2002 as the store's loss prevention manager. Prior to accepting this position, Ritter was a certified law enforcement officer with previous experience working as a police officer for the City of St. Peters, the Village of Hillsdale, and the City of Pagedale. Ritter also worked in the field of loss prevention for companies such as Service Merchandise, Airborne Express, and Best Buy. Bass Pro's loss prevention agents and officers were aware of Ritter's extensive background when Ritter came on board as the department's manager. Jerry Rogers (hereinafter, "Rogers") was hired as the store's general manager in February 2003. Lee Beasley (hereinafter, "Beasley") was the store's assistant general manager at the time.

The events which precipitated Kelly's termination and the filing of this lawsuit concern a Buick Park Avenue left on the parking lot outside of Bass Pro's retail store. Deborah Bost (hereinafter, "Bost") testified she purchased the Buick at some point in the fall of 2002. Approximately two to four weeks prior to April 11, 2003, Bost testified she encountered transmission problems while driving near Bass Pro's retail store. Initially, Bost turned into a private parking lot, but coasted the Buick toward the lot in front of the store, which she believed to be public parking. Bost maneuvered the Buick into a legal parking space. The Buick was not "movable" when she left it on the parking lot, but it was locked, in good condition, with no sign of visible damage. The license plates on the Buick were hers, but were registered to another vehicle Bost owned. Bost testified she did not contact anyone at Bass Pro to inform them she left the Buick on the parking lot nor did she give any Bass Pro employee permission to enter or tow her vehicle. Bost acknowledged she was unable to transfer the plates over prior to leaving the Buick on the parking lot.

Two store associates reported the Buick sitting on the parking lot to Ritter. Ritter examined the Buick and determined it was abandoned because the windshield was covered in pollen. Ritter directed several loss prevention officers to contact the St. Charles Police Department to have the Buick towed, but the police department declined because the vehicle was parked on private property. Later, Ritter contacted the St. Charles Police Department personally to request that the Buick be towed. The dispatcher informed him that unless the vehicle was inoperable or the registration was not current, then it did not violate any ordinance and they could not authorize it to be towed. In an effort to determine ownership, Ritter contacted Sgt. Michael Akers (hereinafter, "Sgt. Akers") with the St. Charles Police Department. When Ritter asked Sgt. Akers to run the license

plates to determine ownership, Sgt. Akers refused, stating it was against department policy to divulge that information. Further, Sgt. Akers informed Ritter the police department could not tow the vehicle because it was located on private property.

In the early morning hours of Friday, April 11, 2003, Michael McKernon (hereinafter, "McKernon"), a loss prevention agent, was working in the monitoring room at the Bass Pro retail store. Ritter entered the monitoring room around nine o'clock with a "smirked" look about him and told McKernon, "[Y]ou want to see something funny? Watch this[.] I am going to break into that car." Ritter told McKernon he was going to find out who owned the Buick. McKernon positioned the security camera to face the area where the Buick was parked and recorded the entire sequence of events. This video was shown to the jury.

McKernon testified he watched Ritter cross the parking lot with a "slim jim" in his hand.[2] Slim jims are not issued by Bass Pro to loss prevention personnel. Ritter testified he personally owned a slim jim for over twenty years and used the one he kept in his car to gain access to the Buick. The video tape reveals Ritter initially had difficulty gaining access to the Buick and he spent approximately five minutes angling the slim jim in the front passenger side window. Ritter also attempted to pry the same window open by wedging the slim jim in between the window and windshield. After failing to gain access through the front passenger door, Ritter used the slim jim on the rear passenger door and gained entry. Once inside, Ritter searched through the backseat, the glove compartment, sun visor, and the trunk, but removed nothing from the Buick. Ritter testified the car had power locks, which he used to lock the car when he was finished. The video tape shows Ritter kicking the passenger side door shut with his foot after finishing his search. Ritter denied causing any damage to the Buick and conceded it was in good condition when he entered it.

McKernon showed the videotape to Bobby Southerly (hereinafter, "Southerly"), a loss prevention team leader, because he believed Ritter committed the crime of "breaking and entering or tampering" with the Buick. Southerly, who examined the Buick twice prior to April 11th, believed the Buick was parked legally. Southerly testified he was unaware of Ritter's intent or purpose for entering the Buick prior to viewing the videotape. After watching the video, Southerly concluded Ritter committed either "breaking and entering or tampering" and opined Ritter might have damaged the Buick by using an unauthorized slim jim to "break" into the car.

Kelly arrived for his shift at noon. McKernon and Southerly expressed their concerns that Ritter committed a crime by entering the Buick and asked Kelly to view the videotape. Kelly was told Ritter stated he wanted to ascertain the identity of the owner upon entering the Buick. After viewing the videotape, Kelly stated he believed Ritter "lacked probable cause" to enter the Buick because no crime had been committed and it was parked legally. Kelly also believed Ritter used the slim jim improperly and may have damaged the Buick.

Kelly called the St. Charles Police Department from the monitoring room while McKernon and Southerly were present. Kelly spoke with a desk sergeant and relayed a hypothetical situation, omitting the identities of Bass Pro and Ritter, to determine the legality of Ritter's actions. Kelly

2. A "slim jim" is a tool used to unlock a vehicle's door.

informed the desk sergeant the person who entered the vehicle by using a slim jim was attempting to ascertain ownership.

The video was shown repeatedly over the course of the weekend. Several loss prevention agents and officers testified they viewed and/or discussed the video's contents with other members of loss prevention. However, no one discussed the incident outside of the loss prevention department, and at no point did anyone from management tell the members to refrain from discussing the incident.

After repeatedly viewing the videotape, discussing Ritter's actions with several loss prevention agents who had prior law enforcement experience, and anonymously contacting the St. Charles Police Department, Kelly decided to report the incident to management based upon his belief a crime had occurred. Per store policy, Kelly should have reported the incident to his immediate supervisor, which was Ritter, but since Ritter was the subject of the accusation, Kelly was permitted to report the incident to a member of management. Rogers was off that weekend, so Kelly met privately with the assistant manager, Beasley, on Saturday, April 12th.

Kelly testified he described the situation to Beasley and told him there was a videotape of the incident. Kelly offered to show him the tape, but Beasley declined, stating "he might look at it later." Beasley testified he had no prior knowledge of Ritter's actions until Kelly brought them to his attention. Beasley asked who knew about the incident and Kelly answered, "the loss prevention department knows." Kelly indicated he wanted to call Bass Pro's corporate loss prevention manager, but Beasley asked him to wait until he spoke to Rogers and the store's human resources manager, Ron Goetz (hereinafter, "Goetz"). Kelly testified Beasley instructed him "do not let [this] leave the loss prevention department." Beasley testified he directed Kelly "not to talk to anyone about it except [Rogers] and myself" and said he was unaware every loss prevention agent and officer had viewed the video.

After Kelly met with Beasley, Kelly returned to the loss prevention department and told McKernon about their conversation. The video and Kelly's meeting with Beasley were "the topic of conversation" for days in the loss prevention department. Kelly worked his regular shift on Sunday and Monday without further interaction with management about the incident.

On Monday, April 14th, Beasley met with Rogers to discuss what Kelly reported to him. Beasley indicated to Rogers the incident would "stay between us" meaning Beasley, Rogers, and Kelly. Beasley informed Rogers that Kelly contacted the police to discuss the matter. Rogers waited to take any action until he spoke to Ritter.

Rogers met with Ritter when Ritter returned to work on Tuesday, April 15th. Rogers told Ritter that Kelly reported the incident to Beasley and asked Ritter for an explanation. Ritter told him he was notified about the abandoned Buick, attempted to have the police department determine ownership or have it towed, and after those efforts failed, he used his personal slim jim to open up the car to ascertain ownership. Rogers testified he found Ritter's explanation reasonable, considered the incident a "non-issue," and did not reprimand Ritter for entering the Buick. Rogers testified he was unaware the Buick was on the parking lot prior to this incident, he did not review the videotape, and did not interview any other loss prevention personnel after speaking to Ritter.

Tuesday evening Ritter was contacted by a loss prevention officer who told him about Kelly's meeting with Beasley. This

officer relayed Kelly's threat to contact Bass Pro's corporate loss prevention manager in an effort to get Ritter discharged or he would turn the videotape over to the authorities. Upon arriving at work on Wednesday, April 16th, Ritter confronted McKernon about the call made to the St. Charles Police Department. Ritter threatened that when he found out who made the call, "their employment with Bass Pro was going to be cut short." Ritter met with Rogers later that day and told him about Kelly discussing his meeting with Beasley with other loss prevention agents. Ritter did not make any recommendation as to what action should be taken.

Based upon his meeting with Ritter, Rogers contacted Goetz. They concluded Kelly was insubordinate because he failed to follow Beasley's directive to not discuss the incident any further with anyone and as a result, Kelly would be terminated. Bass Pro's protocol for terminating employees requires the unanimous agreement of the employee's immediate supervisor and two members of management. If the employee's immediate supervisor is involved in the incident, he or she cannot be involved in the decision to terminate. Following this protocol, Rogers called John Sargent (hereinafter, "Sargent"), Bass Pro's regional human resources manager, to discuss the issue. Rogers told Sargent that Beasley directed Kelly not to discuss the incident with anyone, but Kelly discussed it with other associates. Rogers and Goetz recommended Kelly should be terminated for insubordination because he violated a direct order of his supervisor. Sargent agreed, despite conducting no independent investigation of the incident and without viewing the videotape.

Kelly returned to work on Thursday, April 17th and met with Rogers and Goetz. Rogers asked Kelly if he knew why he was there and he said, "I think so." Rogers asked Kelly for his version of the incident, which Kelly provided, including his call to the police and his belief that Ritter's actions were illegal. Rogers asked Kelly if he was familiar with a rule in Bass Pro's "Loss Prevention Code of Conduct" about disobeying an order from a supervisor. At this point, Kelly was told he was terminated for disobeying Beasley's direct order that he refrain from discussing the incident further with anyone. Kelly denied getting a direct order and told Rogers he was instructed to keep the discussion within the loss prevention department. At the conclusion of the meeting, Kelly was terminated.

Within a week after Kelly was fired, Rogers called a loss prevention department meeting. Rogers told the department members he gave Ritter permission to "break into" the Buick. Rogers also explained Kelly was terminated for going outside of the chain of command by contacting the police about Ritter's actions and for failing to follow proper protocol with respect to his meeting with Beasley. Rogers stated Kelly was not fired for reporting the incident, but for revealing the content of the discussion he had with Beasley to other loss prevention department members after being explicitly told to refrain from doing so. Rogers also indicated the topic could no longer be discussed, and anyone who did so would lose their jobs as well.

On June 12, 2003, Kelly filed a single count petition alleging Bass Pro terminated him because he was a "whistle blower" for reporting Ritter's crime of breaking and entering a motor vehicle while employed by Bass Pro. Kelly alleged he was discharged for reporting this incident, which was a violation of the public policy exception to Missouri's employment-at-will doctrine. Kelly sought actual damages in

the form of lost wages and benefits, along with punitive damages.

Trial commenced on April 25, 2006. Bass Pro filed a motion for directed verdict at the close of Kelly's case, alleging Kelly failed to make a submissible case regarding retaliatory discharge. Specifically, Bass Pro alleged Kelly failed to identify a law or clear mandate of public policy that he believed Ritter violated. The trial court denied Bass Pro's motion. Bass Pro later moved for directed verdict at the close of all of the evidence, alleging again Kelly submitted insufficient evidence to support his claim of retaliatory discharge. The trial court denied this motion and submitted the case to the jury. The jury found in Kelly's favor, assessing an award of $4300.00 in actual damages and holding Bass Pro liable for $2.8 million in punitive damages. Bass Pro now appeals.

■ We begin with Bass Pro's third point, which challenges the submissibility of Kelly's claim for wrongful termination. Specifically, Bass Pro argues Kelly failed to prove he had an objectively reasonable basis to believe Ritter committed a crime when he entered Bost's vehicle.

Upon review of the trial court's denial of a motion for directed verdict or JNOV, we must determine whether the plaintiff made a submissible case. *Brown v. Bailey,* 210 S.W.3d 397, 404 (Mo.App. E.D.2006). "To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Kelly v. State Farm Mut. Auto. Ins. Co.,* 218 S.W.3d 517, 520–21 (Mo.App. W.D.2007)(*quoting Blue v. Harrah's N. Kansas City, L.L.C.,* 170 S.W.3d 466, 472 (Mo.App. W.D.2005)). We take the evidence in the light most favorable to the verdict, giving the prevailing party all rea-

sonable inferences from the verdict and disregarding the unfavorable evidence. *Hodges v. City of St. Louis,* 217 S.W.3d 278, 280 (Mo. banc 2007). "A jury verdict will not be overturned unless there is a complete absence of probative facts to support the verdict." *Martha's Hands, LLC v. Starrs,* 208 S.W.3d 309, 314 (Mo.App. E.D.2006).

■ The employment-at-will doctrine provides that an employer can discharge an at-will employee at any time for cause or without cause. *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 870–71 (Mo.App. W.D.1985). One public policy exception to the at-will employment doctrine "provides that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge." *Williams v. Thomas,* 961 S.W.2d 869, 873 (Mo.App. S.D.1998)(*quoting Boyle,* 700 S.W.2d at 871).

■ In *Dunn v. Enterprise Rent–A–Car,* 170 S.W.3d 1 (Mo.App. E.D.2005), this Court held it was unnecessary for an employee to "allege or prove conclusively the law has been violated in order to state a cause of action" when the employee held a reasonable belief illegal conduct or conduct against a clear mandate of public policy has occurred. *Dunn,* 170 S.W.3d at 9. The *Dunn* court, relying upon the Illinois case of *Johnson v. World Color Press, Inc.,* 147 Ill.App.3d 746, 101 Ill.Dec. 251, 498 N.E.2d 575 (Ill.App. 5th Dist.1986) noted "an employee who has a reasonable belief that illegal activity is taking place should be able to report such belief to his or her supervisors without fear of termination." *Dunn,* 170 S.W.3d at 8; *Johnson,* 101 Ill.Dec. 251, 498 N.E.2d at 578. Moreover, public policy encourages an "employee to report *suspected* wrongdoing by coworkers" which he or she reasonably

believes to have occurred. *Dunn*, 170 S.W.3d at 10. (Emphasis in original).

In the instant case, we believe Kelly made a submissible case for wrongful termination based upon his reasonable belief that Ritter committed a crime by entering Bost's vehicle without her consent. Kelly spoke to McKernon, who heard Ritter say he was going to "break into that car" and he viewed the videotape repeatedly. Kelly observed Ritter using a slim jim, a tool not provided by Bass Pro and not authorized for use, to obtain entry to the Buick, which was parked legally on private property. Further, Kelly discussed the issue with several loss prevention members to determine whether Ritter's actions were illegal prior to reporting them to management. Each person Kelly spoke to indicated they thought Ritter committed the crime of either tampering or breaking and entering. Kelly even went so far as to contact the St. Charles Police Department anonymously and presented a hypothetical situation with all of the pertinent facts. Based upon that phone call, his conversations with other loss prevention members, and observing the tape, Kelly decided to report the incident to management because he believed a crime had occurred.

Moreover, there was ample evidence presented that linked Kelly's termination with the reporting of the incident. *See Dunn*, 170 S.W.3d at 9. First, taking the facts in the light most favorable to the verdict, the jury clearly believed Kelly when he testified Beasley told him to keep their discussion within the loss prevention department as instructed in the loss prevention code of conduct. The loss prevention code of conduct was admitted at trial.[3] Kelly testified he adhered to these guidelines by discussing the incident exclusively with other loss prevention members, thus following Beasley's instruction.

Moreover, Rogers testified he was going to terminate Kelly regardless of whether Ritter committed an actual crime. Rogers, Beasley, and Sargent all testified they failed to investigate the incident. No one in Bass Pro's management interviewed McKernon who heard Ritter say he was going to "break into that car." Further, no one viewed the videotape to ascertain the facts prior to determining what, if any, disciplinary action to take against Kelly, despite having access to the tape for several days prior to Kelly's termination. Even after Rogers discovered McKernon taped the incident, he did not watch the videotape until his deposition was taken.

Most compelling is that Rogers held a meeting shortly after terminating Kelly. At that meeting, Rogers told the loss prevention team he gave Ritter permission to "break into" the Buick despite having no knowledge of the Buick or the incident until two days after it occurred. Rogers threatened that anyone who continued to discuss the issue would be terminated as well. Later, Rogers learned several loss prevention employees continued to discuss the matter after the meeting, but none of them were fired.

Bass Pro makes much of the fact that no crime actually occurred, and Kelly could not point to a specific law he believed that was violated. In *Dunn*, this Court held that in order for an employee to present a submissible case for reporting the alleged wrongdoing of a coworker, the employee "was required to identify a law or clear mandate of public policy that [the employee] believed [the supervisor] violated or would violate...." *Dunn*, 170 S.W.3d at

---

**3.** The code of conduct recognizes loss prevention personnel "are privy to confidential information" that must be "kept confidential and *within* the Loss Prevention Department" and not "discussed with any associate *outside*" the department. (Emphasis added).

11. The employee is not required to prove an actual violation of law; however, he or she must cite some legal authority for the belief that the employer or coworker's conduct was unlawful or contrary to a clear mandate of public policy. *Id.*

Kelly and several other loss prevention members who had law enforcement experience testified they believed Ritter committed the crime of tampering in the second degree. Section 569.090.1(1) RSMo (2000) states "a person commits the crime of tampering in the second degree if he or she ... tampers with property of another for the purpose of causing substantial inconvenience to that person or to another." Bass Pro argues there was no evidence presented that Ritter's actions caused "substantial inconvenience" to Bost when he entered her vehicle to ostensibly determine ownership. Kelly was not required to prove each element of the crime he reasonably believed Ritter committed beyond a reasonable doubt. Rather, *Dunn* directs a plaintiff to cite legal authority, which Kelly presented at trial, and that it was not necessary to prove an actual violation occurred.[4]

Based upon the foregoing, we find sufficient evidence to support submission of this issue to the jury for wrongful termination based upon Kelly's reasonable belief that a crime had been committed when Ritter entered Bost's car, and his compliance with his supervisor's directive to not discuss the matter outside of the loss prevention department. Bass Pro's third point is denied.

▇ Since Kelly made a submissible case for wrongful termination, we now turn to Bass Pro's points relating to the punitive damages award of $2.8 million. In its first point, Bass Pro argues the trial court erred in submitting and subsequently entering an award in Kelly's favor for punitive damages, in that Kelly failed to make a submissible case because there was insufficient evidence of malice presented to support the award.

▇ When reviewing whether a plaintiff has made a submissible case for punitive damages, we look at the evidence in the light most favorable to submission, while disregarding all evidence and inferences which are adverse thereto. *Hoyt v. GE Capital Mortg. Services, Inc.*, 193 S.W.3d 315, 322 (Mo.App.E.D.2006). "A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 109 (Mo.App. E.D.2006). To determine whether Bass Pro exhibited malice sufficient to support an award of punitive damages, we must examine whether Bass Pro committed a wrongful act intentionally and without just cause or excuse. *Hoyt*, 193 S.W.3d at 322.

Based upon our review of the facts in the light most favorable to submission, we find Kelly presented sufficient evidence to submit the issue of punitive damages to the jury. Initially, we note the incident that precipitated Kelly's termination was a wrongful act intentionally done by a member of Bass Pro's management. Based

---

**4.** Even *assuming arguendo* that Kelly needed to prove each and every element, a reasonable inference drawn from the video demonstrates Ritter damaged the Buick with his prolonged use of the slim jim and his kicking the door shut after it would not close when he used his hand. This evidence could support the "substantial inconvenience" element of tampering in the second degree.

upon his previous conversations with officers at the St. Charles Police Department, Ritter knew the Buick was parked on private property, not owned by Bass Pro, and could not be towed legally by law enforcement. Instead of requesting someone from upper management contact Greater Missouri Builders, the owner of the parking lot, to see if it could have the Buick towed, Ritter took action on his own. Ritter knew the parking lot was monitored via closed circuit television, yet prior to going out onto the parking lot with the alleged intent to determine ownership of the vehicle, he bragged to McKernon, "[Y]ou want to see something funny?" and directed him to "Watch this[.] I am going to break into that car." Thereafter, Ritter entered private property and proceeded to gain access to the vehicle by using his personal slim jim, an entry tool neither provided by or authorized for use by Bass Pro. Finally, upon learning that his behavior had been relayed to management, Ritter threatened that when he found out who reported him, "their employment with Bass Pro was going to be cut short."

Additionally, Bass Pro's response to Ritter's conduct, as shown by management's failure to interview anyone other than Ritter or investigate the incident by taking the minimal step of viewing the videotape prior to Kelly's termination, was without just cause or excuse, thus evidencing Bass Pro's reckless indifference to the possible crime a senior member of its management committed. With respect to viewing the tape, Kelly offered to show Beasley the tape, but Beasley declined, stating "he might look at it later." Rogers did not view the videotape until after Kelly filed this lawsuit. Most telling is Rogers' testimony that he was going to terminate Kelly regardless of whether Ritter committed an actual crime and that he told the loss prevention members after Kelly's termination that he authorized Ritter to "break into" the Buick, despite having no knowledge of the Buick or Ritter's actions until several days after it occurred.

All of this evidence, taken together, was sufficient proof of malice to submit the issue of punitive damages to the jury based upon Bass Pro's outrageous conduct. Bass Pro's first point is denied.

■ In its second point, Bass Pro Bass Pro challenges the punitive damages award on constitutional grounds, claiming the $2.8 million verdict violated due process. We agree, finding Bass Pro's constitutional challenge to the punitive damage award requires reversal and remand.

■ As a general matter, the assessment of punitive damages is a function left primarily for the jury. *Miller v. Levering Regional Health Care Center*, 202 S.W.3d 614, 618 (Mo.App.E.D.2006). To prevail on its claim that Kelly's punitive damages award is unconstitutionally excessive, Bass Pro bears the burden of proof. *Id.* Our court reviews the constitutionality of an award of punitive damages by examining three factors: "(1) the reprehensibility of the defendant's conduct; (2) the disparity between the harm and punitive damages award; and (3) the difference between the punitive award and penalties authorized or imposed in comparable cases." *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 145 (Mo. banc 2005)(Teitelman, J., concurring); *State Farm. Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

We focus our analysis on the second Campbell guidepost, "the disparity between the harm and punitive damages award" because we find it compels reversal of Kelly's punitive damages award. In Campbell, the United States Supreme Court stated generally, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a sig-

nificant degree, will satisfy due process." *Campbell*, 538 U.S. at 424, 123 S.Ct. 1513. Moreover, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* We are mindful of the *Scott* court's admonition that appellate courts do not have "license to toss aside considered jury verdicts based upon arbitrary ratios or mathematical formulae [because to] do so would undermine the essential deterrent effect provided by properly awarded punitive damages." *Scott*, 176 S.W.3d at 144 (Teitelman, J., concurring). However, the Campbell court reasoned, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with ratios in [the] range of 500 to 1." *Campbell*, 538 U.S. at 424, 123 S.Ct. 1513. Further, we "must ensure the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426, 123 S.Ct. 1513.

In this case, Kelly was awarded $4,300.00 in compensatory damages to cover his lost wages and benefits from the time he was terminated until he found alternative employment and $2.8 million in punitive damages. This resulted in a ratio of 651 to 1. This ratio raises a presumption of unconstitutionality per the holding in Campbell. Upon examining whether the punitive damages award was reasonable and proportionate to the harm Kelly suffered by being terminated and unemployed for a relatively brief time, we must find the award is excessive and disproportionate. Thus, we are constrained by the United States Supreme Court's holding in Campbell and find Kelly's punitive damages

award was unconstitutionally excessive and must be remanded for reconsideration.[5] Bass Pro's second point is granted.

Based on the foregoing, we affirm the trial court's judgment with respect to Kelly's claims for wrongful termination, the actual damages award, and punitive damages. We reverse and remand the cause for further proceedings consistent with this opinion.

ROBERT G. DOWD, JR., J., and PATRICIA L. COHEN, J., concur.

---

**5.** Once there has been a jury finding as to the proper amount of punitive damages, the trial court can determine whether the amount of the award is in accordance with Campbell, *supra,* and enter judgment accordingly.