Vicky J. DOOMS, Plaintiff–Respondent,

v.

FIRST HOME SAVINGS BANK, and First Bancshares, Inc., Defendants–Appellants.

No. SD 31282.

Missouri Court of Appeals, Southern District, Division One.

March 1, 2012.

Motion for Rehearing and Transfer Denied March 22, 2012.

Mark E. Brinkmann, Springfield, MO, for Appellants.

John D. Lynn, St. Louis, MO, for Respondent.

DON E. BURRELL, Presiding Judge.

Vicky J. Dooms ("Plaintiff") sued her former employer, First Home Savings Bank ("Bank"), and its parent company, First Bancshares, Inc. (collectively, "Defendants"), for damages based on a claim that Defendants wrongfully discharged Plaintiff from her employment in violation of public policy. The case was tried to a jury, which returned verdicts awarding Plaintiff $182,000 in compensatory damages and an additional $235,000 in punitive damages. The trial court entered judgment consistent with the jury's verdicts.

Defendants now appeal that judgment in three points relied on that claim the trial court erred in: 1) submitting punitive damages to the jury because there was no clear and convincing evidence of evil motive or reckless indifference on the part of Defendants; 2) denying Defendants' motion for remittitur "because the $235,000 [punitive damages] award violates due process in that there was no evidence of reprehensibility"; and 3) not granting a motion for a new trial on the issue of punitive damages because the jury based its award on Defendants' gross assets instead of net worth.

Finding no merit in any of these claims, we affirm the judgment of the trial court.

## Applicable Law & Principles of Review

■■■■ A public-policy exception to the employment-at-will doctrine provides that an employer may be liable for damages if the employer terminates an at-will employee "(1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010).[1] The employee's "whistle blowing" need not be the exclusive cause of termination, but only a contributing factor. *Id.* at 94–95. In a whistle-blowing case, "[w]hether there is sufficient evidence to support an award of punitive damages is a question of law." *Drury v. Missouri Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 573 (Mo.App. E.D.2008).

When reviewing whether a plaintiff has made a submissible case for punitive damages, we look at the evidence in the light most favorable to submission, while disregarding all evidence and inferences which are adverse thereto. *Hoyt v. GE Capital Mortg. Services, Inc.*, 193 S.W.3d 315, 322 (Mo.App.E.D.2006). "A

---

1. The at-will employment doctrine is subject to public policy exceptions because "[t]o find otherwise would allow employers to discharge employees, without consequence, for doing that which is beneficial to society." *Id.*

submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 109 (Mo.App. E.D.2006).

*Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 849 (Mo.App. E.D.2007).

 "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Whether a punitive damages award comports with constitutional due process requirements is also reviewed *de novo*. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). "The rule has long been established that to preserve constitutional questions for review on appeal, the constitutional issue must be raised in the trial court at the earliest opportunity, consistent with good pleading and orderly procedure." *Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 701 (Mo. banc 2008).

 "A party's failure to object at trial to testimony, evidence or argument preserves nothing for review on appeal." *Collins v. Hertenstein*, 90 S.W.3d 87, 100 (Mo.App. W.D.2002). "If reviewed at all, unpreserved error is reviewed only for plain error." *Ledure v. BNSF Ry. Co.*, 351 S.W.3d 13, 20 (Mo.App. S.D.2011).

## Facts and Procedural Background

"We view all the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except to the extent that it aids the plaintiff's case." *Dunn v. Enterprise Rent–A–Car Co.*, 170 S.W.3d 1, 3 (Mo.App. E.D.2005). Our following summary of the relevant evidence is presented in accordance with this standard.

Plaintiff worked at Bank's Mountain Grove location from 1987 until April 10, 2007. After her initial employment as a receptionist, Plaintiff was promoted to facilities manager in 2000 or 2001. She also became the "security officer" at the Mountain Grove location in approximately 2003, and additional duties relating to foreclosed properties were assigned to her in 2003 or 2004.

Sometime in 2005, Plaintiff told Susan Uchtman, Bank's chief financial officer, that Bank's president, Charles Schumacher, had authorized a loan to his brother in Nebraska and that a lawsuit regarding that loan had been filed. Uchtman testified that the loan violated certain federal banking regulations. In summer 2005, after the federal Office of Thrift Supervision ("OTS") had summoned Bank's board of directors to a meeting in Dallas, Texas, Plaintiff observed Schumacher putting many documents in the shredding bin. Plaintiff reported what she saw to Uchtman. Uchtman and Colleen Stofer, Bank's operations officer, opened the shredding bin and discovered that it contained loan documents. Uchtman and Stofer recalled that the documents included materials that dealt with a loan to one of Schumacher's family members. A state regulatory examination of Bank was scheduled to take place "within a month" of that event.

Schumacher told Plaintiff to take specific property off the foreclosed list because he had told a Bank board member that it had been sold. Plaintiff took it off the foreclosed list for one month and then put it back on. Plaintiff reported her concerns to John Moody, a member of Bank's board

of directors, who also happened to be a judge. Moody came to Bank and met with Uchtman, Stofer, and Plaintiff. Schumacher left his employment with Bank within one-to-two weeks of that meeting.

Jim Duncan was hired as Bank's new president at the end of 2005. Six employees resigned in February 2006, after announcing that they were resigning from Bank so that they could form a branch for another bank. The departing employees were observed taking bank information with them. Although Plaintiff reported this alleged behavior to Duncan, she believed that he did not take any action on it.

Plaintiff also became concerned when Duncan began making loans outside Bank's geographic area to his associates in Poplar Bluff. Plaintiff approached Duncan about these out-of-area loans and told him that he was "going down the same path [Schumacher] went down." Duncan replied, "[Schumacher's] not as smart as I am." When Plaintiff told Duncan that he needed people who would "help [him] make the changes we have to have at [Bank,]" his reply was, "I want people who will do things the way I want them done. I want people in here who think like I do."

In summer 2006, Sonya Everett, Bank's human resources director, told Duncan "something to th[e] effect" that Plaintiff, Uchtman, and Stofer had been responsible for Schumacher's firing. In June 2006, Stofer confronted Duncan with concerns about Bank's Springfield loan office accepting deposits before they were authorized to do so and not running checks on the deposits as required by "the Patriot Act." Later that day, Duncan came to see Stofer and told her, "I think its time you retire or change your attitude[.]" Stofer resigned the following day. Duncan bragged to Plaintiff about his firing of Stofer, stating, "I got rid of Colleen. Susan's going to be next and anybody else

who gives me problems, who disagrees with the way I do things."

Duncan then hired Adrian Rushing to replace Stofer. Rushing testified that within eight or nine days of starting work, he began keeping a "timeline" on Plaintiff and directed the "IT" unit to forward to him all of Plaintiff's incoming and outgoing emails. Rushing said he kept the timeline because Harold Glass, another of Bank's board members (who was also an attorney), and Everett asked him to do it after there had been a conflict between Plaintiff and another employee. Rushing admitted that although he thought neither employee had acted appropriately, he did not keep a timeline on the other employee. Rushing kept the timeline on Plaintiff until around the time she was fired.

On some date in summer 2006, Plaintiff contacted Moody and reported "risky loans[,]" "out-of-the-area loans[,]" and customer information protection issues to him. Plaintiff told Moody, "We're not cleaning up all the things we were supposed to take care of as far as the OTS was concerned. The loans [a]re still terrible. We [a]ren't making any progress." Duncan told Plaintiff the next day that he had heard about her report to Moody from another board member and told her, "I got rid of Colleen, Susan's going to go next, and then you."

In July 2006, Plaintiff asked Duncan about her performance evaluation because "about everybody in [Bank] had one done already but [her], and [she] didn't have one." Duncan told Plaintiff, "I don't have any problem with the way you do your work. I've talked to everybody in this bank, and I don't have any problem with the way you do your work. It's your politics I don't like." Plaintiff understood this to mean that Duncan was telling her not to go "to board members with anything."

Shortly before OTS examiners arrived for Bank's July 2006 examination, Rushing collected the foreclosure documents from Plaintiff and told her to refer any OTS questions to him. When an examiner asked Plaintiff to show him a new policy for foreclosed properties, Plaintiff told him that she did not have it. Rushing then gave Plaintiff a copy of the new policy and told her to tell OTS that it was the policy Bank had used. Plaintiff had never seen it before. When the examiner asked her again about the policy, Plaintiff replied, "It is not the policy we use."

On July 25, 2006, Plaintiff's job description was changed to remove her duties as security officer even though she thought she was still the security officer as far as the board was concerned. Plaintiff remained the contact person for local law enforcement, the fire department, and the alarm and elevator companies. When Plaintiff asked Everett and Rushing questions about her duties, she was told that she would have to speak with Bank's attorney.

In August 2006, Plaintiff wrote a letter to Bank's board of directors that described the change in her duties. It also stated that "other employees [were] casually discarded with little regard to experience or loyalty" and "we can't process the existing loans or complete documentation for the locations we have." Finally, the letter stated, "I believe the board entrusted [Duncan] to apply practical business ethics in the running of [Bank]. I believe you are not getting what you have paid for. Thank you for your time and consideration." The letter was received into evidence. Plaintiff received no actual response to the letter, but in the month that followed, Rushing changed Bank's locks and alarm codes and refused to provide Plaintiff with a key.

That same month, September 2006, Uchtman informed Duncan and the head of the audit committee, Bill Hixon, of problems with "out-of-territory loans" and "issues that were coming up in the operations side[.]" She also informed them that she "would not be able to sign the annual filing with the SEC [Securities and Exchange Commission] unless these violations were disclosed." Uchtman was fired three days later.

A Memorandum of Understanding ("MOU") with the SEC was executed between Bank and OTS in December 2006. The MOU memorialized the actions to be taken by Bank "to correct the unsatisfactory conditions and regulatory violations discussed in the OTS report of examination, dated July 24, 2006." The MOU was admitted into evidence. Duncan testified that he signed the MOU, then left Bank that same month. Duncan admitted that he had made unsecured loans outside Bank's "primary territory[.]" Duncan testified that he was not fired, but resigned.

Dan Katzfey testified that he became Bank's president in January 2007. Katzfey confirmed that he wrote a memo in February 2007 that instructed Bank employees that Bank's charitable donations would be stopped. That memo was admitted into evidence. Katzfey held a meeting with employees two days after sending the memo to reiterate that charitable donations must stop. Katzfey also told the employees to stop having "anything to do with people from other banks" because the other banks were stealing Bank's employees and Bank's information was leaking out.

In February 2007, Plaintiff had surgery to treat an injury she had suffered sometime in late November 2006 when she fell on the job while carrying a box. Plaintiff was supposed to be off work for six weeks after her surgery, but she returned to work about two weeks after her surgery. Plaintiff asked her doctor to release her

after two weeks because she "was afraid [she] was going to lose [her] job." Plaintiff wound up in the emergency room with swelling in her leg on the day before she had planned to go back to work at Bank. Plaintiff had her husband take paperwork related to her emergency room visit into Bank the next day. Plaintiff received a voice message from Rushing stating that he did not know why she was not back at work and if she was not there the next day Bank would "take action against" her. Plaintiff called Rushing to explain the situation, and Rushing again told her that Bank would take action if she was not at work the next day.

Rushing conceded in his testimony that he knew Plaintiff's knee injury was serious and that she was not faking it. Everett admitted that she communicated with the worker's compensation insurance company about firing Plaintiff while her worker's compensation claim was pending even though Everett could not remember a legitimate reason for firing Plaintiff at that time. A February 23, 2007 email from Everett to Rushing and Bank's new president, Dan Katzfey, was received into evidence. It read:

> Talked with Work Comp. They advised that we should not terminate [Plaintiff] as long as this claim was going on. However, they did say that they would not drag it out. See my attachment for details. I am forwarding [Plaintiff's] email to me from 2/22/07 to Ms. Lorenz for her file.
>
> I have not sent this to Jeff Love. If you will, please email his email address to me. I apparently have sent wrong [sic] in the past.
>
> Thanks, Sonya.

When Plaintiff returned to work in February 2007, she was denied email access for about a week. The reason given to her for the denial was that she had not signed a new internet policy that had been dis-

tributed while she was away. As a result, Plaintiff "couldn't communicate with the people in [her] own buildings without walking." Plaintiff conceded that Bank had telephones, but she stated that some of her work required carrying supplies and checking on departments that could not be done by phone.

In March 2007, Plaintiff realized that she was being followed by someone. Because she was concerned that it might implicate bank security, Plaintiff alerted her coworkers, including Rushing and Katzfey. She also reported the matter to the police. Plaintiff said a highway patrolman showed her a picture of the man following her and informed her that he was a private investigator assigned to follow her because of her worker's compensation claim.

Plaintiff had worked yearly for each of the past eleven years on "Bank Night"—an activity supporting the American Cancer Society's "Relay for Life." On April 6, 2007, Plaintiff sent an email to an American Cancer Society representative, the chairperson of "Relay for Life," and the co-chair for "Bank Night." Plaintiff's email stated:

> Kim, Deb & Stephanie,
>
> I realize this is coming up on the eleventh hour . . . . but I believe we need to find a different location for bank night. My job has changed considerably here at First Home Savings and I don't believe our commitment to the community is as it has been in the past. As a matter of fact, any project I am connected with, [sic] seems to be given very low priority, or cancelled completely. Rather than see
>
> Relay done away with completely, I have stepped back and let others step up.
>
> I have not been the driving force in fund raising, as in the past.

I'm very sorry to say, after nearly 20 years with First Home, I don't believe I have the authority to conduct 'after-hours activities'.

Please forgive my waiting until nearly the last meeting, I hoped things would change, but they have not.

Maybe Legacy would offer their new digs as a meeting place for bank night?

So sorry to be the bearer of bad news.

[Plaintiff] (Original formatting retained.)

Rushing obtained the email message and forwarded it to Katzfey, Everett, and Mike Housely, the manager of Bank's Mountain Grove location. Everett admitted both that Bank had previously participated in "Bank Night" and that Bank's decision to stop making charitable contributions was not a secret.

Plaintiff was fired on April 10, 2007, when Everett, Rushing, Katzfey, and Housely met with her. Plaintiff's annual salary at the time of her discharge was $26,000. Plaintiff continued to look for work, but she had not found a new job at the time of trial. Plaintiff lost confidence in herself, she was humiliated and she felt like people in the community thought she had done something wrong. When asked why she did not contact a doctor or counselor to deal with her emotional distress, Plaintiff said, "Because I was embarrassed and because I didn't have a job. You know, I just felt like you had to gut it out, you just—you know. I finally had to get something to help me sleep because I wouldn't sleep at night." Plaintiff testified that she did not "even want to get out of the house on some days." She also reached the point where she would do her grocery shopping "at ten and eleven o'clock at night because [she] had custom-ers who would come to [her] and say, [']Well, what in the world happened; why is [Bank] in such a mess; why did you get fired?[']"

Defendants' motions for judgment at the close of Plaintiff's evidence and for directed verdict after the close of all evidence are not included in the legal file.[2] In addressing the latter motion, defense counsel told the trial court that "we don't believe [Plaintiff had] established a submissible case on the issue of punitive damages to the jury. And we also filed a motion for directed verdict, an amended version, so to speak, this morning on that issue, as well." The trial court denied both motions. The jury returned a verdict that awarded Plaintiff $182,000 in compensatory damages and found Defendants liable for punitive damages.

Based on the jury's finding that Bank was liable for punitive damages, the following additional evidence related to the appropriate amount of such damages was presented. Plaintiff was a Bank shareholder at the time of trial. She identified Exhibit 65, a quarterly statement of Bank for 2011, which reported that Bank's assets as of September 30, 2010 were $214,805,000. It also listed stockholders' equity at "$22.5 million[.]" Exhibit 65 was admitted into evidence. During Defendants' cross-examination of Plaintiff, the following exchange occurred:

Q. I would just ask you—you've mentioned the total assets, but can you tell us what the total liabilities are? Because, obviously, if you own a house that's worth $200,000, but you still owe a hundred and fifty, your net worth on the house is $50,000.

---

**2.** Based on Defendants' failure to include the written motion in the record on appeal, we presume that it would provide no support for Defendants' claim of error. *See Delaney v. Gleed,* 169 S.W.3d 84, 87 (Mo.App. S.D.2005) (appellant is to provide reviewing "court with all of the documents which support his contentions and matters omitted from the record will not be presumed to be favorable to [the a]ppellant").

A. Not without looking at the financial statement, I couldn't tell you that.

[Defense Counsel]: Your Honor, I would argue that that number is not the number that the jury needs to hear. They need to hear what the net—

[Plaintiffs Counsel]: Objection, Your Honor. May we approach?

THE [TRIAL] COURT: Yes, come forward.

(Counsel approached the bench and the following proceedings were held in the presence [sic] of the jury:)

[Plaintiff's Counsel]: If he has some other number, he can put it on. If he wants to take a recess and get another number, I don't mind that. But to say, to tell the jury this is not the number they're supposed to hear, that's not a permissible question.

[Defense counsel]: Well, could you give us a few moments, then, after we talk to [Plaintiff]? Because I think we do have a different number that is the proper one.

THE [TRIAL] COURT: Okay. That would be fine.

(The proceedings returned to open court.)

[Defense counsel]: No more questions.

Defendants called Donna Alcorn, Bank's branch manager for its Ava location, as a witness. Alcorn agreed that the "[$]214 million dollar amount mentioned by [Plaintiff's counsel]" was stated on a document she was provided in connection with her testimony but that "[t]he total stockholders' equity is $22,504,595."

In Plaintiff's closing argument for punitive damages, counsel stated: "[Bank] obviously has a lot of money. We're not asking you to award us a lot of money. Even if you just look at the value of the stock of [Bank], it's twenty-two point—twenty-two and a half million dollars." Then, near the end of the argument, counsel stated:

I'm going to suggest a range. Obviously, you all have to make the decision. I think somewhere between $225,000 and $450,000 is about right. $225,000 is one-tenth of one percent of the value of the equity of the First Home Savings Bank. Four hundred and fifty is one-fifth of one percent. It's not a million dollars. It's not a half a million dollars. But it needs to be enough that they will sit up and take notice and know how important you feel their responsibility is to the community.

The following comprises the entirety of Defendants' closing argument on the appropriate amount of punitive damages.

As I said to you a few minutes ago, I believe the 182 million—or thousand number that you came out with for compensatory most certainly will get the board of directors' attention, and I don't believe any further amount will be necessary. Though if you do think of an amount, I would suggest that something that's even larger than her compensatory damages is certainly not necessary to get [Bank's] attention, if that's what you're trying to do. You certainly—again, as I said earlier, we respect the process, we respect your decision, and though I would recommend a much, much, much lower number than the numbers that [Plaintiff's counsel] has suggested to you. Anyway, thank you very much.

Plaintiff made no rebuttal closing argument.

After deliberating, the jury returned a verdict awarding Plaintiff punitive damages of $235,000. After the trial court entered a judgment consistent with the jury's verdicts, Bank filed, with supporting suggestions, a "motion for judgment notwithstanding the verdict, or in the alternative, remittitur, or, in the alternative, motion for a new trial" ("the post-trial

motion").[3] Defendants appealed from the judgment after the trial court failed to grant any relief on the post-trial motion.

## Analysis

### Point I—Submissible Case for Punitive Damages

■■■ Defendants' first point contends the trial court erred in submitting punitive damages to the jury (and thereafter entering a judgment awarding them) "because Plaintiff did not have a submissible case for punitive damages in that there was no clear and convincing evidence of evil motive or reckless indifference sufficient to support such an award." Defendants offer several arguments in support of this position, including that "[t]he only harm that Defendants caused to Plaintiff was the termination of her employment" and that wrongful discharge claims do not automatically include consideration of punitive damages, citing *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578 (Mo.App. W.D.2002).[4]

In *Altenhofen*, the plaintiff sued his former employer "for unpaid overtime (Count I), for retaliatory discharge in violation of the FLSA [Fair Labor Standards Act] (Count II), and for retaliatory discharge in violation of Missouri public policy (Count III)." 81 S.W.3d at 583. The jury awarded damages on all three counts, including punitive damages on both retaliatory discharge counts. The trial court's judgment, however, did not award any punitive damages. *Id.* at 583–84. The judgment also excluded the jury's award of actual damages based on retaliatory discharge in violation of public policy on the ground that it was duplicative of the compensatory damages the jury awarded on the plaintiff's Count II FLSA claim. *Id.* at 591. The plaintiff did not appeal the duplicative damages finding, and the Western District agreed with the trial court that punitive damages may not be awarded on a count in the absence of actual or nominal damages. *Id.* As for punitive damages, the Western District found that the plaintiff did not demonstrate "by clear and convinc-

---

3. The judgment also awarded post-judgment interest and stated "that one-half (½) of the punitive damages award is deemed to be rendered in favor of the State of Missouri." *See* section 537.675.3. Unless otherwise indicated, all statutory references are to RSMo Cum. Supp.2010.

4. To hold otherwise, say Defendants, "would make punitive damages mandatory in every proven case of retaliatory discharge." But this raised spectre of mandatory liability appears to be a mere bogeyman as Defendants cite no authority for the proposition that the existence of substantial evidence of evil motive or reckless indifference *requires* a jury to award punitive damages. Defendants also cite *Philip Morris USA v. Williams*, 549 U.S. 346, 356–57, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) ("a jury may not punish for the harm caused others") and argue that the jury could not base its punitive damages verdict on Uchtman's termination and Stofer's "forced" retirement because these things caused Plaintiff no injury. Defendants argue that their mo-

tions in limine "to preclude Plaintiff from going outside of the pleadings" and to "preclude the admission of evidence regarding [Uchtman's] lawsuit" were granted. "Rulings on motions in limine are interlocutory and subject to change during the course of the trial." *Peters v. General Motors Corp.*, 200 S.W.3d 1, 15 (Mo.App. W.D.2006). In *Philip Morris*, the defendant had requested a limiting instruction and "[t]he Supreme Court was clear to indicate that such protective measures must be made available to protect the defendant's rights 'upon request.' *Id.* at [357, 127 S.Ct. 1057]." *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 597–98 (Mo.App. W.D.2008). Here, Defendants objected to Uchtman's testimony regarding what she thought Duncan meant by her "actions over the previous several days" on the grounds of hearsay and speculation, but they permitted Stofer and Plaintiff to describe these events without objection. And, it does not appear from the record that Defendants requested a limiting instruction.

ing evidence that [the employer's] misconduct was so outrageous because of [the employer's] evil motive or reckless indifference to the rights of others that punitive damages must be awarded." *Id.* at 592.

Plaintiff responds that Defendants have not asserted that Plaintiff's "retaliatory discharge" was not supported by substantial evidence and that the jury's verdict in Plaintiff's favor on that claim "necessarily encompassed a finding that Defendant[s] acted with a deliberate intent to deprive [Plaintiff] of her job in order to get back at her" and that "[s]uch a vindictive state of mind was sufficient" for an award of punitive damages, citing *Wiedower v. ACF Indus. Inc.*, 715 S.W.2d 303 (Mo.App. E.D. 1986). In that case, Wiedower claimed he had been fired for exercising his rights under the workers' compensation law—a retaliatory discharge suit brought under section 287.780, RSMo 1978. *Id.* at 304. On review, the Eastern District held that the evidence supporting the retaliatory discharge also supported "the elements of knowledge and intent which are necessary to support the legal malice required for punitive damages." *Id.* at 308.

In the instant case, Plaintiff's retaliatory discharge claim was brought under neither the FLSA nor section 287.780; it was brought under Missouri's common law public-policy exception to the general rule that at-will employees may be terminated for any reason or for no reason at all. Plaintiff argued that Defendants' treatment of her after she suffered her work-related injury demonstrated that Bank wanted to fire Plaintiff even though it had no legitimate reason for doing so and that

Defendants used Plaintiff's physical condition as a means of mistreating her because of her "whistle-blowing," not because Defendants were unhappy that she had filed a worker's compensation claim. As a result, although neither *Altenhofen* nor *Wiedower* are precisely on point, they do stand for the proposition that a specific level of knowledge or intent is necessary to support a punitive damages award.[5]

 In the context of a retaliatory discharge in violation of public policy, the claim at issue here,

[p]unitive damages require clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred. *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 109 (Mo.App. E.D.2006). The necessary mental state is found when a person intentionally does a wrongful act without just cause or excuse. *Id.* When someone intentionally commits a wrong and knew that it was wrong at the time, an evil motive and wanton behavior is exhibited. *Id.* An evil intent may also be inferred where a person recklessly disregards the rights and interests of another person. *Id.* Punitive damages are an extraordinary and harsh remedy and should be applied only sparingly. *Romeo v. Jones*, 144 S.W.3d 324, 334 (Mo.App. E.D.2004).

*Drury*, 259 S.W.3d at 573. "A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing

---

5. As indicated above, *Altenhofen* stated that the plaintiff, to demonstrate the necessary legal malice, "was required to present clear and convincing evidence that [t]he appellants' conduct was outrageous because of evil motive or reckless indifference[,]" and concluded

that no such evidence was submitted. 81 S.W.3d at 590. In *Wiedower*, the Court found that "there was sufficient evidence in this case for the jury to find either legal malice or actual malice on the part of the defendant." 715 S.W.2d at 308.

clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference."[6] *Id.*

■ In *Drury,* the Court considered employer conduct similar to that presented here. An employee reported an act of sexual misconduct that she observed being committed by a board member toward a fellow employee. 259 S.W.3d at 563. Even though the employer then found after an investigation that such misconduct had occurred, the employee who reported the conduct began to be evaluated differently by the employer. *Id.* at 563–64. The employer also changed the locks, eventually eliminated the employee's position, and then offered her a new position that, according to one witness, could not actually produce the same salary that she had previously earned. *Id.* at 573–74. The Eastern District found that this evidence made a submissible case that the employer "intentionally committed a wrong and knew that [it was] doing so; thus, the jury could infer [that the employer] had an evil motive." *Id.* at 574. "Proof offered to support an employee's underlying substantive claim and the employee's additional claim for punitive damages need not be mutually exclusive, and often is not."[7] *Williams v. Trans States*

*Airlines, Inc.,* 281 S.W.3d 854, 870–71 (Mo. App. E.D.2009).

■ Here, Plaintiff made a submissible case that Defendants had an evil motive for terminating her employment based on the following evidence. Plaintiff's supervisor, Rushing, who was hired by Duncan to replace Stofer, had been keeping a "timeline" on Plaintiff and monitoring her email from near the time he began working for Bank to the time Plaintiff was fired. No such timeline was kept on the other employee who had been involved in the conflict that allegedly led to the keeping of the timeline on Plaintiff. Everett told Duncan that Plaintiff, Stofer, and Uchtman had previously reported wrongdoing. In July 2006, Plaintiff refused to corroborate information Rushing had given OTS. After that refusal, Plaintiff's job duties were changed, and Rushing and Everett refused to answer her questions about those changed duties. After Plaintiff wrote a letter to Bank's board reporting the situation, Rushing changed the locks and refused to give Plaintiff a key.

Everett asked about firing Plaintiff while her worker's compensation claim was pending (sending an email about it to Rushing and Katzfey) even though Everett

**6.** The trial transcript indicates that the jury was instructed on separate elements for purposes of compensatory damages and punitive damages. The trial court read Instruction No. 6 as including that the jury must find that Plaintiff's "reported violations of federal banking law and regulations to her superiors" or her "refus[al] to participate[ ] in illegal activity under federal banking law and regulations" "was a contributing factor in her discharge" in order to find Defendants liable for compensatory damages. The trial court read Instruction No. 8 as stating that the jury may find liability for punitive damages if they believed that Defendants' conduct as described in "Instruction No. 6 was outrageous because of defendants' evil motive or reckless indifference to the rights of others[.]" The trial court read Instruction No. 4 as stating that the

burden of proof was on "[P]laintiff to cause you to believe that the evidence has clearly and convincingly established the propositions of facts required for the recovery of punitive damages as submitted in Instruction No. 8."

**7.** In their argument supporting point one, Defendants also seem to challenge the factual basis for liability for compensatory damages as they attack the connection between Plaintiff's actions regarding Schumacher and Duncan and her eventual firing by Katzfey. None of Defendants' points challenge the judgment's award of compensatory damages. "This court is not obliged to determine questions that are not stated in the points relied on." *Henderson v. Fields,* 68 S.W.3d 455, 483 (Mo.App. W.D.2001).

knew of no legitimate reason why Plaintiff should be fired. In April 2007, four months after OTS required Bank to execute a MOU to address the problems discovered during OTS's July 2006 examination of Bank, Everett, Rushing, Katzfey, and Housely were involved in firing Plaintiff after Plaintiff sent her email about the cancellation of "Bank Night" despite the fact that Bank's discontinuation of community charitable contributions was not a secret. This constituted substantial evidence from which a reasonable juror could conclude that Defendants intentionally and wrongfully fired Plaintiff in reckless disregard for her rights and interests. *See Drury*, 259 S.W.3d at 573. Point one is denied.

### Point II—Due Process Challenge

■ Defendants' second point contends "[t]he trial court erred in denying Defendants' motion for remittitur regarding the punitive damages because the $235,000 award violates due process in that there was no evidence of reprehensibility[.]" Plaintiff's position is that Defendants' constitutional challenge was not preserved for appellate review because it was not presented to the trial court. We agree.

■ To properly raise a constitutional question, a party must:
(1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated, such as by explicit reference to the article and section or by quotation of the provision itself; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review.

*United C.O.D. v. State of Missouri*, 150 S.W.3d 311, 313 (Mo. banc 2004). The rule requiring the presentation of a constitutional issue as soon as possible exists "to prevent surprise to the opposing party and to allow the trial court the opportunity to identify and rule on the issue." *Carpenter*, 250 S.W.3d at 701. Rule 84.13(a) and (c)[8] provides that "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case." *See also Mathes v. Sher Express, L.L.C.*, 200 S.W.3d 97, 112 (Mo.App. W.D.2006) (holding that a claim that certain evidence was irrelevant would not be considered on appeal when the objection lodged at trial was that the evidence was prejudicial and cumulative).

No objection to the punitive damages verdict is reflected in the record surrounding the jury's return. Defendants' post-trial motion did not allege that the punitive damages verdict violated constitutional due process protections and did not contain the term "due process." Instead, it alleged that plaintiff had failed to make a submissible case for punitive damages and, in the alternative, that punitive damages should be reduced to "$23,500 in accordance with the actual and admissible value of net worth and in accordance with [Plaintiff's] argument regarding the amount of punitive damages." Finally, Defendants' request for a new trial was based on a claim that the verdicts were against the weight of the evidence.

Defendants contend in their reply brief that their post-trial motion raised the "substance" of a due process claim in that the "constitutional challenge depends on the same or similar factors as the challenges made and presented to the [t]rial [c]ourt." This claim falls well short of the requirements set forth by our high court in *United C.O.D.*, 150 S.W.3d at 313. Point II is denied.

8. All rule references are to Missouri Court Rules (2011).

### Point III—Plain Error in Closing Argument

Finally, Defendants contend "[t]he trial court erred in not granting a new trial on the issue of punitive damages because [Plaintiff] introduced evidence of Defendants' assets alone and made an erroneous argument for a punitive damage award based on those assets[.]" Defendants' point also contends that the difference between the value of Bank's assets and net worth was "a factor of 10 leading to a manifest injustice[.]" In the argument that follows their third point, Defendants concede that "[t]he failure to object to Plaintiff's erroneous closing argument resulted in limiting the trial court to considering the motion for new trial under the plain error standard of Rule 78.08."

> [Rule 78.08] allows discretionary review of plain errors affecting substantial rights if the court finds a manifest injustice or miscarriage of justice has resulted. [*Giddens v. Kansas City S. Ry. Co.*, 937 S.W.2d 300, 306 (Mo.App. W.D. 1996).] Such review is best accomplished by the trial judge, who is in a far better position than the appeals court to fairly determine the effects of unobjected argument or evidence on the jury's verdict. *Id.* The trial court has no duty to grant a new trial unless the effect of the misconduct was so prejudicial that a party did not receive a fair trial.

*McCormack v. Capital Elec. Constr. Co., Inc.*, 159 S.W.3d 387, 398 (Mo.App. W.D. 2004).

Plain error review is "rarely granted in civil cases." *City of Greenwood, Missouri v. Martin Marietta Materials, Inc.*, 299 S.W.3d 606, 617 (Mo.App. W.D.2009). Further, it is rarely granted for errors related to closing arguments, and when such review is granted, the "closing arguments are not viewed in isolation." *Rush v. Senior Citizens Nursing Home Dist. of Ray Cnty., Missouri,* 212 S.W.3d 155, 163 (Mo.App. W.D.2006).

In addition to choosing not to object to Plaintiff's closing argument, Defendants also elected not to address in closing argument any particular problem with the figures Plaintiff had used to support her punitive damages request; Defendants simply argued that the jury should award no additional damages or award damages that were a "much, much, much lower number than" Plaintiff suggested.

We do not find this to be one of those rare cases in which plain error review of an allegedly improper closing argument in a civil case would be appropriate. As a result, we decline to engage in it. Point three is also denied, and the judgment of the trial court is affirmed.

RAHMEYER and LYNCH, JJ., Concur.