Thomas P. DUNN, Appellant,

v.

ENTERPRISE RENT–A–CAR
COMPANY, Respondent.

No. ED 83240.

Missouri Court of Appeals,
Eastern District,
Division One.

April 12, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 2, 2005.

Application for Transfer Denied
Sept. 20, 2005.

Jerome J. Dobson, Matthew John Ghio, St. Louis, MO, for appellant.

Michael A. Kahn, Julie M. Kennedy, Andrew Davis, San Francisco, CA, Gordon L. Ankney, St. Louis, MO, for respondent.

BOOKER T. SHAW, Judge.

Thomas P. Dunn ("Dunn") appeals from the trial court's judgment granting Enterprise Rent–A–Car Company's ("Enterprise") motions for directed verdict on Dunn's claim that he was wrongfully discharged for refusing to violate the law or a clear mandate of public policy, and on his claim that he was wrongfully discharged in violation of public policy for reporting conduct by Enterprise that he reasonably believed violated federal securities laws. Dunn also appeals from the trial court's judgment granting Enterprise's motion for judgment notwithstanding the verdict or in the alternative, for a new trial, after the jury returned a verdict of $4,000,000 in favor of Dunn on his claim that he was wrongfully discharged in violation of public policy for reporting Enterprise's illegal business practices in Missouri and other states. We reverse and remand in part, and affirm in part.

In reviewing a trial court's judgment granting a motion for directed verdict, we must determine whether the plaintiff made a submissible case, i.e., whether the plaintiff introduced substantial evidence at trial that tends to prove the essential facts for his or her recovery. *Wright v. Over–the–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen*, 945 S.W.2d 481, 489 (Mo.App. W.D.1997). We view all the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except to the extent that it aids the plaintiff's case. *Id.* "There is a presumption in favor of reversing a trial court's grant of a motion for directed verdict unless, upon consideration of the facts most favorable to the plaintiff, 'those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result.'" *Id.* (quoting *Friend v. Holman*, 888 S.W.2d 369, 371 (Mo.App. W.D.1994)).

Viewing the evidence in the light most favorable to Dunn, we find as follows:

Dunn began working for Enterprise in 1986 as an accountant. In early 1993, Dunn became Enterprise's corporate comptroller and an officer of the company. In 1994, Dunn earned Vice–President officer level status as corporate comptroller, where he remained until his termination on January 4, 2001. During the time Dunn was employed by Enterprise, he always received positive performance reviews.

Dunn testified at trial that as the company's comptroller, he certified each year that the company's financial records were prepared in accordance with generally accepted accounting principles ("GAAP"). It would have also been Dunn's responsibility as corporate comptroller to certify that the company's financial statements were prepared in accordance with GAAP for an initial public offering ("IPO"). Dunn reported to John O'Connell ("O'Connell"), Enterprise's Chief Financial Officer, as corporate comptroller. O'Connell reported to Enterprise's President and Chief Executive Officer, Andy Taylor.

Enterprise is a privately held company and the majority of the company is owned by the Taylor family. In May 1998, O'Connell directed Dunn to begin investigating issues to enable Enterprise to prepare for an IPO. Dunn testified that Enterprise's senior management received high cash compensation and the company could not go public with such high levels of cash compensation. Dunn worked on the issue of executive compensation for an IPO for over a year. Dunn recommended that Enterprise use stock options as a substitute for cash to address the compensation issue, which the company began doing in 1999.

In preparation for the IPO, Dunn began to take a closer look at Enterprise's financial statements and business practices. Some of these practices included the imposition of a surcharge on daily rental customers, billing customers for damages to rental vehicles and selectively licensing its vehicles in certain states. Dunn testified that he spoke to upper management about concerns he had relating to these practices, but it was explained to him that Enterprise did not wish to make changes.

Another issue of concern in preparation for the IPO was the rate of depreciation Enterprise used on its vehicles. Dunn testified Enterprise purchased its vehicles and depreciated them at the rate of 2% per month. He also testified, however, that this depreciation rate overstated the real depreciation of Enterprise's rental vehicles and while this was considered acceptable for a privately held company, a depreciation rate of 2% for a publicly held company was a violation of GAAP. Dunn testified that if Enterprise were to go public with the IPO, GAAP would require that Enterprise lower its depreciation rate to no more than 1.5% per month.

In June 1999, Andy Taylor invited Dunn to a company strategic planning meeting where the company's investment banker gave a presentation suggesting that if the company went public, it would have to reduce its depreciation rate from 2% to 1.5%. Dunn testified that Jack Taylor, Enterprise's founder, was openly opposed to this suggestion. Shortly after this meeting, Dunn approached O'Connell and told him he agreed with the investment banker that Enterprise's depreciation rate would have to be decreased to 1.5% if they went public. He also told O'Connell the U.S. Securities and Exchange Commission ("SEC") would likely require Enterprise to report its retail car sales as a gross revenue figure and as a separate line of business for SEC purposes. O'Connell told him that the Taylors were not going to lower the company's depreciation rate. Dunn subsequently received a warning at

work and was placed on probation until November 1999. Dunn also testified that after completing this probationary period, Andy Taylor told O'Connell that Dunn could stay with Enterprise "as long as [he] behaved."

During this same time period, Dunn was assigned responsibilities relating to the IPO, including whether the company would have to "gross up" its retail car sales operations and whether it would have to do "segment reporting." As a private company, Enterprise's financial statements disclosed only the net revenues generated from retail car sales, and not the gross revenues generated from those sales. This permitted Enterprise the potential to reflect a higher level of profit on its statements. As Dunn explained, by grossing up Enterprise's retail car sales operations, Enterprise would have to show the revenue generated from such sales on the revenue portion of the income statement, and show the cost of sales for that revenue item in the cost of sale section of the statement. Therefore, all the revenues and costs of sale would be presented in the statement. In addition, as a private company, Enterprise's financial statements did not separately set out its financials for its three lines of business: car sales, leasing and daily rentals. Dunn told O'Connell he believed Enterprise would be required to gross up retail car sales and do segment reporting in connection with the IPO. O'Connell told Dunn that senior management did not want to do this. Dunn was then assigned the responsibility of researching and determining whether Enterprise could avoid grossing up retail car sales and segment reporting, and whether it would have to lower its depreciation rate to 1.5% for the IPO. Dunn reiterated to O'Connell on several occasions that Enterprise's depreciation rate of 2% was unrealistic and that 1.5% was the highest rate

Enterprise could be able to use for the IPO.

In order for a company to offer stock to the public, it must file a Form S–1 with the SEC. With respect to the Form S–1, as corporate comptroller, Dunn testified he was responsible for preparing Enterprise's financial statements in accordance with GAAP. The financial statements would be provided to and audited by Enterprise's auditor, Ernst & Young. During the audit process, Dunn and other senior managers would be asked to sign a management representation letter, certifying that the financial statements were prepared according to GAAP. Ernst & Young would then issue an audit opinion letter attached to the Form S–1, stating that the financial statements were prepared according to GAAP. Dunn testified that Ernst & Young would depend and rely upon Enterprise's representations in certifying to the SEC that Enterprise's financial statements were prepared according to GAAP.

Enterprise established October 27, 2000 as the target date for filing the Form S–1. Dunn and his staff prepared memoranda known as "White Papers" setting forth his department's recommendations and conclusions regarding the IPO accounting issues. Dunn concluded Enterprise would have to lower its depreciation rate on daily rental vehicles to 1.5%. In subsequent documents, Dunn continued to urge Enterprise to alter its accounting methods in the areas of depreciation and segment accounting. Dunn subsequently learned the White Papers were rewritten without his knowledge or approval and set forth different accounting conclusions. In October 2000, Dunn learned Enterprise extended its target date for filing the Form S–1 from October 27, 2000, to January or February of 2001.

Shortly after this postponement, Dunn testified he was excluded from a presenta-

tion O'Connell made to corporate officers on the issue of depreciation. In November 2000, O'Connell issued a memorandum announcing Enterprise was changing its depreciation rate from 2% to a flat rate of 1.7%, which Dunn believed was not consistent with GAAP. In December 2000, O'Connell made a presentation to Enterprise's Board of Directors regarding the IPO. O'Connell told the Board that Enterprise was thinking of going forward with the IPO in the Spring of 2001. On January 4, 2001, Dunn was terminated from his employment at Enterprise. Dunn filed his petition for wrongful discharge in the Circuit Court of St. Louis County on May 3, 2001.

This case went to trial on March 13, 2003. After Dunn rested his case, Enterprise moved for a directed verdict with respect to Dunn's claims that he was wrongfully terminated for refusing to commit an illegal act and for blowing the whistle on Enterprise's alleged illegal conduct. The trial court initially denied Enterprise's motions. Several days later, during Enterprise's presentation of its case, Enterprise renewed its motions for directed verdict on these claims. The trial court reversed its previous rulings and granted Enterprise's motions for directed verdict. The case was then only submitted to the jury on Dunn's whistleblowing claim regarding Enterprise's alleged illegal business practices. The jury returned a verdict in favor of Dunn in the amount of $4,000,000. Enterprise then filed its motion for JNOV and motion for new trial. The trial court granted Enterprise's motion for JNOV and in the alternative, motion for new trial. This appeal follows.

In his first point on appeal, Dunn argues the trial court erred in granting Enterprise's motion for directed verdict on his claim that he was wrongfully discharged in violation of public policy for refusing to perform an illegal act. Dunn contends he presented sufficient evidence to make a submissible case that he was wrongfully terminated because he refused to prepare financial statements for Enterprise's proposed IPO that were not in accordance with GAAP, and which he reasonably believed would violate SEC regulations.

■■ Generally, an employee who does not have a contract which contains a statement of duration is an employee at-will and may be discharged at any time, with or without cause, and the employer will not be liable for wrongful discharge. *Lueth-ans v. Washington Univ.*, 894 S.W.2d 169, 172 (Mo. banc 1995). However, Missouri courts have recognized public policy exceptions to the employment at-will doctrine in *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.App. W.D.1985). *See Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 936 (Mo.App. W.D.1998). The public policy exception to the at-will employment doctrine "provides that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge." *Boyle*, 700 S.W.2d at 871. Public policy "finds its sources in . . . the letter and purpose of a constitutional, statutory or regulatory provision or scheme. . . ." *Id.*

■■ An employee has a cause of action for wrongful discharge if he or she was discharged for: "(1) refusing to perform an illegal act or an act contrary to a strong mandate of public policy; (2) reporting wrongdoing or violations of law or public policy by the employer or fellow employees to superiors or third parties; (3) acting in a manner public policy would encourage . . .; or (4) filing a workers' compensation claim." *Porter*, 962 S.W.2d at 935–36. In order to make a submissible case for wrongful discharge based upon the first public policy exception listed

above, that the employee was discharged for refusing to perform an illegal act or an act contrary to a strong mandate of public policy, the plaintiff must demonstrate the "conduct required of him by the employer would have amounted to a violation of a statute, constitutional provision or regulation ..., and also that his discharge was attributable to a refusal to perform the unlawful act...." *Crockett v. Mid–America Health Services*, 780 S.W.2d 656, 658 (Mo.App. W.D.1989).

In the case before us, we must determine whether Dunn made a submissible case on his claim that he was wrongfully discharged in violation of public policy for refusing to perform an illegal act or an act contrary to a clear mandate of public policy. Enterprise argues it violated no law and did not request Dunn to violate any law, and therefore Dunn failed to make a submissible case on this cause of action.

Dunn relies upon SEC Regulation S–X, 17 C.F.R. Part 210, which sets forth the form, content of, and requirements for financial statements required to be filed with the SEC pursuant to the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, to support his claim that he refused to violate the law or a clear mandate of public policy. The trial court's judgment granting Enterprise's motion for directed verdict on Dunn's claim that he was discharged for refusing to violate the law was based upon its belief that any action Dunn refused to perform could not have violated any law. We find the trial court's judgment in this respect erroneous.

Before a private company can offer securities for sale on a public stock exchange, it must file certain documents with the SEC, including the Form S–1 and financial statements that have been prepared in accordance with SEC regulations.

*See* 17 C.F.R. Part 229 (Regulation S–K); 17 C.F.R § 239.11 (Form S–1). Regulation S–X requires that financial statements be prepared in accordance with GAAP, and statements not prepared in accordance with GAAP "will be presumed to be misleading or inaccurate...." 17 C.F.R. § 210.4–01(a)(1). As Enterprise's corporate comptroller and chief accountant, Dunn testified he was responsible for preparing its financial statements, which would have included the financial statements attached to the Form S–1. Dunn presented evidence at trial that the accounting methods Enterprise directed him to use in financial statements related to its IPO were not in accordance with GAAP. Dunn also presented evidence at trial to establish that he refused to comply with Enterprise's instructions to use improper accounting methods to prepare its financial statements, and that he was terminated as a result of this refusal.

Although the actions Dunn was directed to perform did not ultimately violate the law because Enterprise postponed its IPO, we believe Dunn should still be protected by the public policy exceptions to the employment at-will doctrine for his refusal to perform those actions. While no Missouri case has directly addressed this issue and set of factual circumstances, the Illinois Court of Appeals in *Johnson v. World Color Press, Inc.*, 147 Ill.App.3d 746, 101 Ill.Dec. 251, 498 N.E.2d 575 (1986), has, and we find its analysis and holding instructive here.

In *Johnson*, the plaintiff was the senior vice-president and chief financial officer of a privately owned subsidiary of a publicly-traded company. *Id.* at 576. He was terminated by the company and subsequently filed a petition for retaliatory discharge alleging he was terminated due to his opposition to certain accounting practices of the company which he believed

violated federal securities laws. *Id.* Specifically, the plaintiff alleged certain company accounting practices did not conform with GAAP and their effect was to overstate the income of the company and to inflate the company's asset valuation. *Id.* at 577. The plaintiff specifically relied on Regulation S–X. *Id.* at 580.

The Illinois court acknowledged the tort of retaliatory discharge as an exception to the general at-will employment doctrine and that a cause of action for retaliatory discharge may be brought by a plaintiff when he or she is terminated "in violation of a clearly mandated public policy." *Id.* at 576. The court concluded that this mandate could be national in its scope and the Securities Act of 1933 and the Securities Exchange Act of 1934 "establish a clearly mandated public policy." *Id.* at 576–77. The court reasoned, "[t]he Securities Act of 1933 ... was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and to promote ethical standards of honesty and fair dealing." *Id.* at 577. It also found the Securities Exchange Act of 1934 "was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *Id.* The court noted, "public policy favors full disclosure, truthfulness and accuracy in the financial reports made by businesses to the government and to the public, and that an employee who voices objection to practices which he reasonably believes violate this policy should be protected from being discharged as a result of such objection." *Id.* at 578. The court ultimately reversed and remanded the trial court's judgment dismissing the

plaintiff's petition for retaliatory discharge because the plaintiff sufficiently alleged he was discharged in retaliation for his actions, and his termination was in violation of a clearly mandated public policy. *Id.* at 580.

■ We agree with the court's reasoning in *Johnson* that the Securities Act of 1933 and the Securities Exchange Act of 1934 "establish a clearly mandated public policy" requiring companies who seek to offer securities on a public stock exchange to provide full financial disclosures to inform and protect future investors. *See id.* at 576–78. Similarly, we conclude that an employee who is terminated from his or her employment for objecting to practices he or she reasonably believes violate this policy, such as Dunn in our case, should be protected from termination. *See id.* at 578.

The defendants in the *Johnson* case proceeded to make several arguments, similar to Enterprise in our case, contending that the plaintiff did not make a submissible case for retaliatory discharge. We will address two of these arguments below as they are instructive to our analysis and holding.

First, the defendants in *Johnson* argued the plaintiff failed to plead facts that showed an actual violation of federal securities laws. *Id.* The court held "a plaintiff attempting to state a cause of action for retaliatory discharge after being fired for reporting *possible illegal activity* need not allege or prove conclusively the law has been violated in order to state a cause of action." *Id.* (emphasis added). The court further noted that an employee who has a reasonable belief that illegal activity is taking place should be able to report such belief to his or her superiors without fear of termination. *Id.*

As in *Johnson,* under the circumstances of this case, where Dunn is alleging a cause of action for wrongful discharge after being terminated for refusing to perform what he reasonably believed to be illegal conduct or conduct against a clear mandate of public policy, we find it was not necessary for him to "allege or prove conclusively the law has been violated in order to state a cause of action." *Id.* This is particularly true where Dunn's refusal may have been one reason, if not one of the primary reasons, that Enterprise decided to extend the deadline for the IPO.

Additionally, Dunn testified the reason he refused to prepare the financial statements contrary to GAAP was because he was attempting to stop Enterprise's efforts to submit unlawful documents with respect to its IPO. Because he may have been instrumental in helping to prevent what he reasonably believed to be an unlawful act, he should be protected by law for his efforts. It is illogical under this set of circumstances that the public policy exception to the employment at-will doctrine would fail to protect Dunn from termination of his employment because Enterprise ultimately did not complete the alleged unlawful act.

The defendants in *Johnson* also argued that federal securities laws do not apply to the company because it is not a publicly-owned company. *Id.* at 579. The court found, however, that it was reasonable for the plaintiff to believe that improper accounting entries in the financial statements of the privately-held company could be incorporated into and affect the financial statements of the publicly held parent company and could possibly mislead investors and place the parent company in violation of the securities laws. *Id.* The court held the "plaintiff should not be charged with knowing conclusively whether the se-

curities laws have been violated, but rather an allegation that he reasonably believed the complained of practices might be illegal was sufficient." *Id.*

We agree with the court's reasoning in *Johnson* and find this argument, also made by Enterprise, equally unpersuasive. Similar to the plaintiff in *Johnson,* Dunn reasonably believed, based upon the evidence presented, that financial statements prepared by him, using improper accounting methods would be incorporated into the registration statement that Enterprise was planning to file with the SEC in connection with its IPO. At the time Dunn refused to prepare the financial statements, Enterprise had a deadline for filing its registration statement and was taking the necessary steps to meet this deadline. Dunn should not be denied protection under the public policy exception to the employment at-will doctrine for refusing to perform an illegal act or act contrary to a clear mandate of public policy simply because Enterprise decided to postpone the IPO and not complete its alleged unlawful act.

Viewing the evidence in the light most favorable to Dunn, we find Dunn presented sufficient evidence at trial that the conduct he was asked to engage in with respect to Enterprise's financial statements in preparation for the IPO would have been in violation of federal securities regulations and a clear mandate of public policy as enunciated in those regulations. Dunn also presented sufficient evidence at trial that linked his termination from Enterprise with his failure to perform this unlawful conduct. Because we find Dunn made a submissible case on this cause of action, the trial court erred in granting a directed verdict on this claim. We reverse and remand this point for further proceedings consistent with this opinion. Point I is granted.

In his second point on appeal, Dunn argues the trial court erred in grant-

ing Enterprise's motion for directed verdict on his claim that he was wrongfully discharged in violation of public policy for blowing the whistle on Enterprise for attempting to use accounting methods in connection with its proposed IPO that were not in accordance with GAAP. Dunn argues public policy encourages employees to report suspected illegal conduct before it occurs, and Dunn reasonably believed that Enterprise would have violated federal laws and regulations by submitting financial statements to the SEC that were prepared using improper accounting methods.

As already discussed above in our analysis of Dunn's first point on appeal, we review the trial court's grant of Enterprise's motion for directed verdict to determine whether Dunn made a submissible case. *See Wright*, 945 S.W.2d at 489.

In this point, Dunn claims he made a submissible case under the second public policy exception to the employment at-will doctrine, which requires the employee, in order to have a cause of action under this exception, to report "serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy...." *Boyle*, 700 S.W.2d at 878. The trial court appears to have granted Enterprise's motion for directed verdict on this claim based on its belief that the whistleblower exception to the employment at-will doctrine requires proof that the violation of law or clear mandate of public policy had already been committed at the time the employee reports the conduct. We agree with Dunn that this narrow interpretation of the law is inconsistent with the purpose of public policy.

The essential issue before us here is whether an employee can make a submissible case for wrongful discharge on the whistleblower exception to the employment at-will doctrine when he or she is terminated for reporting in good faith that his or her employer is about to violate the law. We have found no Missouri caselaw directly on point. Public policy does, however, encourage employees to report *suspected* wrongdoing by co-workers. *See Brenneke v. Department of Missouri*, 984 S.W.2d 134, 138–39 (Mo.App. W.D.1998); *Faust v. Ryder Commercial Leasing & Serv.*, 954 S.W.2d 383, 390–91 (Mo.App. W.D.1997). Public policy would certainly not be served by requiring an employee to wait until his or her employer completes the unlawful act before reporting it and before being protected by the whistleblower exception to the employment at-will doctrine.

Here, merely because Enterprise decided to postpone its IPO should not diminish Dunn's claim that he was terminated from his employment for reporting Enterprise's accounting practices that were not in compliance with federal securities regulations. Even though Enterprise's actions ultimately did not violate federal securities regulations because it did not file the necessary IPO documents with the SEC, Dunn could still demonstrate at trial that he had a reasonable belief Enterprise would have violated securities laws by filing financial statements with the SEC that were not prepared according to GAAP, and that Enterprise intended to do so promptly. *See Johnson*, 101 Ill.Dec. 251, 498 N.E.2d at 579 (holding the "plaintiff should not be charged with knowing conclusively whether the securities laws have been violated, but rather an allegation that he reasonably believed the complained of practices might be illegal was sufficient."); *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 684 P.2d 21, 24 (1984) (finding "the social harm from reporting in good faith a complaint that may turn out, after investigation, to be unfounded is potentially far less than the harm of not reporting a well-founded complaint for fear of the consequences.").

Viewing the evidence in the light most favorable to Dunn, we find he presented sufficient evidence at trial to make a submissible case on his claim that Enterprise terminated his employment for reporting conduct by it that he reasonably believed would have violated federal securities regulations. We reverse and remand the trial court's judgment granting Enterprise's motion for a directed verdict on this claim for further proceedings consistent with this opinion. Point II is granted.

In his third point on appeal, Dunn argues the trial court erred in granting Enterprise's motion for judgment notwithstanding the verdict ("JNOV") on his claim that he was discharged in violation of public policy for blowing the whistle on Enterprise for engaging in illegal business practices. Specifically, Dunn argues he was not required to prove the conduct he reported violated any statute, regulation or constitutional provision, and he proved that he reported suspected illegal activity to the appropriate internal authorities at Enterprise.

Our review of the trial court's judgment granting a motion for JNOV is essentially the same as our standard of review of the trial court's granting of a motion for directed verdict. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied*, 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001). We review the trial court's grant of a motion for JNOV to determine whether the plaintiff made a submissible case. *Leo Journagan Const. Co., Inc. v. City Utilities of Springfield, Mo.*, 116 S.W.3d 711, 723 (Mo.App. S.D.2003). In determining whether a submissible case was made, we view the evidence in the light most favorable to Dunn, giving him the benefit of all reasonable inferences that can be drawn from the evidence, disregarding all unfavorable evidence and inferences. *Id.*

"There is a presumption that favors reversal of a JNOV granted to a defendant, unless the favorable evidence and inferences are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result." *Id.* We will affirm the trial court's judgment if it is supported by any of the reasons set forth in defendant's motion for JNOV. *Faust*, 954 S.W.2d at 388.

In this point, Dunn is again claiming he made a submissible case under the second public policy exception to the employment at-will doctrine, for reporting "serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy...." *Boyle*, 700 S.W.2d at 878.

In order for Dunn to make a submissible case on his claim of wrongful discharge for reporting Enterprise's alleged unlawful conduct, Dunn was required to identify a law or clear mandate of public policy that he believed Enterprise violated or would violate with respect to its automobile licensing, sales tax and surcharge practices. *Id.* While we agree with Dunn that in order to make a submissible case on this claim he was not required to prove an actual violation of law, he was still required to cite some legal authority for his belief that such conduct by Enterprise was unlawful or contrary to a clear mandate of public policy. Unlike the claims Dunn asserts in his first and second points on appeal, where he relies on federal securities regulations, the record before us reflects that Dunn failed to cite any such law or clear mandate of public policy with respect to this claim. As such, we agree with the trial court's judgment that Dunn failed to make a submissible case on this cause of action and affirm its grant of Enterprise's motion for JNOV. Point III is denied.

In his fourth and final point on appeal, Dunn argues the trial court erred in alter-

natively granting Enterprise's motion for new trial on his claim that he was wrongfully discharged in violation of public policy for blowing the whistle on Enterprise for engaging in illegal business practices. In its judgment granting Enterprise's motion for JNOV on this claim, the trial court granted in the alternative Enterprise's motion for new trial if on appeal, we reversed its grant of the JNOV. Because we are affirming the trial court's grant of JNOV on this claim as discussed in our analysis above of Dunn's third point, it is no longer necessary for us to address this point on appeal. Point IV is denied.

REVERSED AND REMANDED IN PART; AFFIRMED IN PART.

GEORGE W. DRAPER III, P.J.,
concurs.

SHERRI B. SULLIVAN, J., concurs.