

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

HHS TECHNOLOGY GROUP
HOLDINGS, LLC, et al., )
  )
RESPONDENTS, ) WD86036
  ) (Consolidated with WD86055)
v. )
  ) OPINION FILED:
  ) January 14, 2025
STATE OF MISSOURI, )
  )
APPELLANT. )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Jon E. Beetem, Judge**

**Before Division Four:** Anthony Rex Gabbert, Chief Judge, Presiding,
Karen King Mitchell, Judge, and Alisha D. O'Hara, Special Judge

The State of Missouri appeals from a judgment in favor of EngagePoint, Inc., and

HHS Technology Group Holdings, LLC,[1] arising from a contract dispute involving the

Missouri Eligibility Determination and Enrollment System (MEDES).[2]  The State raises

---

[1] During the course of this litigation, HHS acquired EngagePoint's claims and was substituted in as plaintiff, with EngagePoint remaining as a third-party defendant in the State's claims against it.  For ease of reference, we refer to HHS and EngagePoint collectively as "EngagePoint," unless otherwise indicated.

[2] MEDES resulted from the 2010 Affordable Care Act (ACA), which, among other things, set new standards for Medicaid eligibility (*i.e.*, eligibility based on

four points on appeal. First, the State argues the trial court erred in entering judgment, following a jury trial, awarding EngagePoint $18,945,341 for extra work/constructive change because payment for extra work/constructive change outside of the parties' written contract violated the Missouri Constitution. Second, the State asserts the court erred in awarding prejudgment interest on the judgment for extra work/constructive change and holdbacks because both the contract and § 408.020 barred prejudgment interest. Third, the State contends the trial court erred in entering judgment for EngagePoint on the State's breach of contract claim because the jury instructions for that claim violated the limitations of the force majeure clause in the parties' contract. Fourth, the State argues the trial court erred in entering a directed verdict for EngagePoint on its claim for holdbacks because that decision violated the terms of the parties' contract. For the reasons set forth below, we affirm.

---

"Modified Adjusted Gross Income" (MAGI)), new standards for yet-to-be-built federal Medicaid-related IT systems, and new technical standards for State Medicaid systems that would need to interface with the new federal systems. The ACA also made available to participating states funding to cover up to 90 percent of the cost of achieving technical compliance. Federal funding was to be administered by the Centers for Medicare & Medicaid Services (CMS) and was conditioned on meeting certain CMS requirements, including satisfying what CMS identified as the seven critical success factors for system performance, which were largely tied to CMS's "go-live" dates of October 2013 and January 2014.

**Background**

The State does not challenge the sufficiency of the evidence to support the verdicts. Viewed in the light most favorable to the verdicts, the evidence, as it relates to the issues raised on appeal, showed as follows:[3]

On January 22, 2013, the State issued a Request for Proposal (RFP) for MEDES.[4] The RFP specified that MEDES's core component must be a commercial off-the-shelf (COTS) software "solution," that is, a "commercially available" (as opposed to a custom-built) software product that met several specific requirements outlined in the RFP. The State's specific COTS requirements were derived largely from IBM, which manufactured a COTS product called "Curam." At the time the responses to the RFP were due, Curam, which was regarded as a fairly stable product, was the only COTS option that met the RFP's requirements. In April 2013, IBM demonstrated the functionality, eligibility, and life management capabilities of Curam to the State.

On June 6, 2013, the State awarded EngagePoint, as the prime contractor, a fixed-price contract to build MEDES using Curam.[5] The contract allowed for up to $5 million

---

[3] The record in this case is extensive. We limit our discussion of the facts to those relevant to the issues before us on appeal.

[4] MEDES consisted of three sub-projects: Projects I, II, and III. The State's RFP primarily concerned Projects I and II.

[5] The contract is approximately 1,200 pages in length and consists of (1) the State's RFP (and edits thereto), (2) EngagePoint's response, (3) the State's three Best-And-Final-Offer letters, (4) EngagePoint's three responses thereto, (5) the State's clarifications to the RFP, (6) the notice of contract award, and (7) all subsequent amendments. Only portions of the contract were entered into evidence at trial.

in change orders, and EngagePoint submitted change orders to the State which, when approved, drew down on the $5 million credit.[6]

The contract was to last through June 30, 2018, and the total contract price was $147,000,000. On June 21, 2013, the State licensed Curam directly from IBM, as opposed to having EngagePoint license Curam during the term of the contract. The project kicked off in July 2013.

When MEDES went live in October 2013, Curam did not function as promised by IBM, and EngagePoint spent most of 2014 creating workarounds for Curam's defects. In fall 2014, IBM released an upgraded version of Curam intended to fix many of the problems, but that meant the upgraded version of Curam had to be integrated into MEDES. As a result of Curam's defects, the resulting upgrade, and—among other things—changes to MEDES by CMS and the State, EngagePoint performed substantial additional work at the State's direction.

Under the contract, the State was to make payments in arrears to EngagePoint. Upon acceptance of each deliverable by the State, the State was to withhold a defined percentage of the deliverable amounts due pending final completion of the respective project (holdbacks).

On May 18, 2015, the State terminated EngagePoint as the prime contractor and replaced EngagePoint with IBM, Curam's manufacturer. In addition to hiring four EngagePoint employees as independent contractors to manage MEDES, the State

---

[6] EngagePoint submitted change requests for between $300,000 and $400,000. The State approved approximately $365,000 to $367,000 in change orders.

4

identified 27 other EngagePoint employees who were "critical" to MEDES; thus, the State retained EngagePoint as a MEDES subcontractor for three more years until Project I (the MAGI portion of MEDES) was completed.

In 2016, EngagePoint filed the underlying lawsuit to (1) collect payment for the extra work EngagePoint completed at the State's direction and (2) recover the contractual "holdbacks" the State did not pay out when it terminated EngagePoint as the prime contractor. In 2017, the State countersued for breach of contract.

A jury trial was held from July 7, 2022, to August 11, 2022. On August 8, 2022, the State filed a motion for directed verdict at the close of all the evidence; the court denied the motion as to the issues relevant to this appeal. On August 10, 2022, the trial court granted EngagePoint's oral motion for directed verdict for $4,097,169 on EngagePoint's contractual holdback claim. EngagePoint's extra work/constructive change claim went to the jury. On August 11, 2022, the jury awarded EngagePoint $18,945,341 on its extra work/constructive change claim and rejected the State's counterclaims, including the State's claim for breach of contract related to Project I.

On September 21, 2022, the court issued its judgment reflecting the jury's verdicts. The judgment also awarded EngagePoint prejudgment interest at the statutory rate of nine percent on (1) the holdback damages from May 18, 2015, and (2) the extra work/constructive change damages from March 2, 2016. On October 21, 2022, the State filed a motion for judgment notwithstanding the verdict (JNOV)/motion for new trial. On January 17, 2023, the trial court denied the State's motion for JNOV/new trial.

5

This appeal followed.[7]  Additional facts will be provided below as necessary to address the State's claims.

## Analysis

The State raises four points on appeal.  First, the State argues the trial court erred in entering judgment, following a jury trial, awarding EngagePoint $18,945,341 for extra work/constructive change because payment for extra work/constructive change outside of the contract was unconstitutional.  Second, the State asserts the court erred in awarding prejudgment interest on the judgment for extra work/constructive change and holdbacks because both the contract and § 408.020 barred prejudgment interest.  Third, the State contends the trial court erred in entering judgment for EngagePoint on the State's breach of contract claim because the jury instructions for that claim violated the parties' force majeure clause.  Fourth, the State argues the trial court erred in entering a directed verdict for EngagePoint on its claim for holdbacks because that verdict violated the terms of the contract.  We discuss each point in turn.[8]

---

[7] EngagePoint filed a notice of cross-appeal in Case No. WD86055 but subsequently dismissed the cross-appeal.

[8] EngagePoint argues that we should dismiss the State's appeal because its brief fails to comply with the statement-of-facts and points-relied-on requirements of Rule 84.04.  While EngagePoint makes several valid points, especially with regard to the State's statement of facts, "we prefer to resolve appeals on their merits, especially when we are able to discern the gist of the appellant's allegations of error." *Cass County v. City of Lee's Summit*, 638 S.W.3d 560, 566 n.8 (Mo. App. W.D. 2021) (quoting *Messina v. Shelter Ins. Co.*, 585 S.W.3d 839, 842 n.1 (Mo. App. W.D. 2019)).

**I.    The State's challenges to the trial court's judgment awarding EngagePoint $18,945,341 for extra work/constructive change are either not preserved or are waived.**

Point I challenges the jury's verdict on EngagePoint's breach of contract claim based on extra work/constructive change.  Point I states,

> The trial court erred in entering judgment for . . . EngagePoint for $18,945,341 for extra work/constructive change because payment for extra work/constructive change outside of the written contract violates Art. III, § 39(3) of the Missouri Constitution in that extra work/constructive change requires that the State breach the contract by providing defective specifications, and the jury instructions erroneously did not require the jury to find that the State specified the use of Curam and allowed recovery for work done outside of the change order process.[9]

In other words, the State argues that payment for extra work/constructive change outside the contract violates Art. III, § 39(3), of the Missouri Constitution because (1) extra work/constructive change requires the State to have breached the contract by providing defective specifications, and (2) the instructions were erroneous because they did not require the jury to find that the State mandated the use of Curam.

---

[9] EngagePoint asserts that Point I is multifarious because it includes multiple grounds for reversal.  We agree.  "A multifarious point on appeal preserves nothing for appellate review." *State ex rel. Lewis v. Bd. of Zoning Adjustments, Platte Cnty.*, 688 S.W.3d 29, 37 n.5 (Mo. App. W.D. 2024) (quoting *Crisp v. Mo. Sch. for Deaf, Dep't of Elementary & Secondary Educ.*, 681 S.W.3d 650, 659 (Mo. App. W.D. 2023)). "Nevertheless, '[w]e do have discretion to review non-compliant briefs *ex gratia* when the argument is readily understandable.'" *Id.* (quoting *In re S.M.W.*, 658 S.W.3d 202, 212-13 (Mo. App. W.D. 2022) (internal quotations omitted)).  "This is preferable where, as here, 'we are able to decipher the argument[s] being made by the appellant without becoming an advocate for the appellant[.]'" *Id.* (quoting *State v. Clark*, 503 S.W.3d 235, 237 (Mo. App. W.D. 2016)).  Thus, we exercise our discretion to review the State's first point to the extent we are able to understand it.

In bringing its breach of contract claim for the additional work required by Curam's shortcomings, EngagePoint advanced two theories of recovery—the extra work doctrine and the constructive change doctrine. The extra work doctrine provides, "if the contractor is subjected to increased expense by the negligence of the State[,] or for extra work not called for by his contract, or which the conduct of the State alone rendered necessary, then the contractor may claim extra compensation therefor." *Spitcaufsky v. State Highway Comm'n*, 159 S.W.2d 647, 651 (Mo. 1941). For purposes of this case, constructive change occurs "where the specifications [provided by the State] are defective and, as a result, the contractor is required to perform extra work." *Global Constr., Inc. v. Mo. Highways & Transp. Comm'n*, 963 S.W.2d 340, 343 (Mo. App. W.D. 1997). To avoid the possibility of double recovery, the two theories were presented in a single instructional package, with a single verdict form (Verdict Form A).[10]

### A. The State failed to properly preserve its constitutional challenge to the extra work doctrine.

The State's overarching argument is that the jury's verdict and subsequent judgment awarding EngagePoint damages for extra work/constructive change violated

---

[10] During oral argument, counsel for the State asserted that extra work and constructive change are not distinct theories of recovery but, rather, that constructive change is an exception to the constitutional prohibition on payment for extra work performed under a contract with the State. And, because EngagePoint failed to prove that Curam was a specification of the contract, EngagePoint did not prove its claim for constructive change. However, due to the fact that extra work and constructive change were presented to the jury as alternatives in the same verdict director without requiring the jury to indicate which theory it was relying on, we need not decide the exact relationship between the extra work and constructive change doctrines in order to resolve this appeal.

8

Art. III, § 39(3), of the Missouri Constitution. That section provides, in relevant part,

"The general assembly shall not have power: . . . to grant . . . any extra compensation, fee

or allowance to a . . . contractor after service has been rendered or a contract has been

entered into and performed in whole or in part."

> To properly raise a constitutional challenge, a party must: "(1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to . . . have been violated, such as by explicit reference to the article and section or by quotation of the provision itself; (3) state the facts showing the violation; *and (4) preserve the constitutional question throughout for appellate review.*

*G.B. v. Crossroads Acad.-Cent. St.*, 618 S.W.3d 581, 593 (Mo. App. W.D. 2020)

(quoting *Mayes v. Saint Luke's Hosp. of Kan. City*, 430 S.W.3d 260, 266 (Mo. banc

2014) (emphasis added)). We need look no further than the State's motion for

JNOV/new trial to see that the State failed to preserve the same constitutional challenge it

now raises on appeal.

> In pertinent part, the State's motion for JNOV/new trial stated,

> The Court should grant the State's JNOV because the Mo. Const. prohibits the payment of government funds after work was completed but before a price was agreed upon for that work. Mo. Const.. Art. III, Section 39 (3). This language prohibits the General Assembly from paying more than the original contract amount *for the same deliverable already called for under the contract.* Id. Each item in [EngagePoint]'s Exhibit 1058R, the list of [its damages], was specifically enumerated as a deliverable in the contract.[11]

---

[11] The State made a similar argument in its unsuccessful motion for directed verdict on EngagePoint's claim for breach of contract. The State's motion for directed verdict claimed, in relevant part:

> In addition, the Missouri Constitution forbids even the General Assembly from paying more than the original contract amount *for the same deliverable already called for under the contract . . . .* The contract

(Emphasis added).

The constitutional argument preserved in the State's post-trial motion is not, however, the constitutional argument the State makes on appeal. In its post-trial motion, the State argued the Constitution prohibits payment above the contract price "for the same deliverable *already called for under the contract*." (Emphasis added). By contrast, the State now argues the Constitution forbids "extra work *not included* in the scope of the written contract." (Emphasis added). In other words, the State argued below that the extra work at issue was not constitutionally compensable because it was *not* extra, that is, it was in-scope. On appeal, however, the State argues the extra work was not

required [EngagePoint] to deliver the requirements of Project I for a fixed price. Thus, whatever it actually cost [EngagePoint] to deliver what they did deliver for Project I, the Missouri Constitution expressly prohibits [EngagePoint] from claiming extra compensation for work on those same deliverables after the work was done, as [EngagePoint] is trying to do here. . . . As discussed above, [EngagePoint] was aware that it could not rely on oral promises of extra pay. Regardless, "[a]ll persons dealing with such [State] officers are charged with knowledge of the extent of their authority and are bound, at their peril, to ascertain whether the contemplated contract is within the power conferred." [Citations omitted.] "Surely this rule must be applied to an attempt by a party to a written contract to change its terms, by an oral agreement … when it specifically provides that they have no such authority[.]") It is true that a contractor may be paid breach of contract damages for extra work outside his contract where a "constructive change" occurs—i.e., where the State actually breaches the contract by improperly requiring a contractor to perform work outside his contract through some "unwarranted action." [Citation omitted.] As will be seen below, none of the "unwarranted actions" that can create a constructive change include oral promises to pay extra after work has already been done. In fact, none of the types of actions that can create a constructive change are present in this case.

(Emphasis added).

10

constitutionally compensable because it *was* extra, that is, it was *not* in-scope. "In a jury-tried case, except in circumstances not applicable here, 'allegations of error must be included in a motion for new trial in order to be preserved for appellate review.'" *Eivins v. Mo. Dep't of Corr.*, 695 S.W.3d 212, 220 (Mo. App. W.D. 2024) (quoting Rule 78.07(a)). Accordingly, the State's constitutional challenge to the extra work doctrine is not preserved.[12]

### B. By not objecting to Verdict Form A, the State waived any argument regarding the elements of constructive change.

As we read Point I, it is unclear whether the State's remaining argument challenges submissibility or claims instructional error. But, either way, the argument relates to the doctrine of constructive change, which was an alternate theory of recovery presented to the jury. Verdict Form A permitted the jury to award damages to EngagePoint under either the extra work doctrine or the constructive change doctrine (Instruction Nos. 9 and 11, respectively), without requiring the jury to specify the basis

---

[12] At most, the State would be limited to plain error review of its constitutional claim, but we decline to engage in plain error review because the State "failed to request such review and, even if [the State] had, it 'is rarely granted in civil cases.'" *Bridegan v. Turntine*, 689 S.W.3d 481, 485 n.6 (Mo. banc 2023) (quoting *Williams v. Mercy Clinic Springfield Cmtys.*, 568 S.W.3d 396, 412 (Mo. banc 2019)). "Moreover, a plea for plain error review would have to show 'the trial court committed error that was evident, obvious and clear and where the error resulted in manifest injustice or a miscarriage of justice.'" *Id.* (quoting *Williams*, 568 S.W.3d at 412). "A manifest injustice or miscarriage of justice is one that is 'so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case.'" *Id.* (quoting *Williams*, 568 S.W.3d at 412). The trial court's judgment in favor of EngagePoint on extra work/constructive change damages does not rise to that level.

for its award. Thus, we do not know whether the jury awarded damages under the extra work doctrine, the constructive change doctrine, or both.

The State did not object to Verdict Form A during the instruction conference, at case submission, or before the jury was discharged. "A challenge to the propriety of the form of verdict . . . [i]s due and preserved only by a contemporaneous objection." *Davis v. Stewart Title Guar. Co.*, 726 S.W.2d 839, 857 (Mo. App. W.D. 1987); *Lindsey Masonry Co. v. Jenkins & Assocs., Inc.*, 897 S.W.2d 6, 10 (Mo. App. W.D. 1995) ("A party who has an objection to the verdict form must make the objection known prior to the time the court submits the verdict form to the jury.") By failing to object to Verdict Form A, the State waived any objection it might have had to submitting multiple theories under a single verdict form.

Consequently, to prevail on Point I, the State would have to demonstrate that *both* the extra work and the constructive change claims/instructions were invalid, as *either* could have formed the basis of the verdict. *See McGathey v. Matthew K. Davis Tr.*, 457 S.W.3d 867, 878 (Mo. App. W.D. 2015) (dismissing appeal because appellant failed to challenge each ground on which the trial court could have ruled in respondents' favor); *City of Peculiar v. Hunt Martin Materials, LLC*, 274 S.W.3d 588, 590-91 (Mo. App. W.D. 2009) (finding that, to establish grounds for reversal, appellant must challenge all grounds on which the trial court could have ruled against it); *Mathes v. Sher Express, L.L.C.*, 200 S.W.3d 97, 107 (Mo. App. W.D. 2006) (recognizing "potentially salutary purpose" of using a single verdict form for multiple verdict directing theories in that it "avoid[s] a retrial in the event that some error or insufficiency of evidence was found in

12

only one of the verdict directing theories"). But the State cannot demonstrate the extra work doctrine was invalid because the State did not preserve its challenge to that doctrine. Thus, the State's challenge to the extra work/constructive change judgment fails.

For the foregoing reasons, Point I is denied.

**II. The trial court did not err in awarding prejudgment interest to EngagePoint on the judgment for extra work/constructive change and holdbacks.**

For its second point, the State asserts the trial court erred in awarding prejudgment interest on EngagePoint's breach of contract claim because § 408.020 bars such interest where the damages are unliquidated and not readily ascertainable. The State also argues the trial court erred in awarding EngagePoint prejudgment interest on its holdback and breach of contract claims because the contract bars interest.[13]

"Prejudgment interest can be based only on either statute [here § 408.020] or contract." *Child. Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 202-03 (Mo. App. W.D. 2006). Section 408.020 states, in relevant part, "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after

---

[13] Point II states,

The trial court erred in awarding . . . EngagePoint prejudgment interest on the judgment for extra work/constructive change and holdbacks because both the contract and Mo. Rev. Stat. § 408.020 bar prejudgment interest in that the contract specifically excludes interest from amounts owed by the State, and the extra work/constructive change damages were speculative estimates, not liquidated amounts as the statute requires.

13

they become due and demand of payment is made . . . ."[14]  Prejudgment interest is intended to "fully compensate plaintiffs by accounting for the time-value of money."[15]  *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463, 477 (Mo. App. E.D. 2013).

Prejudgment interest under § 408.020 may be ordered only "if the claim is either liquidated, meaning fixed and determined, or readily ascertainable by computation or recognized standards."  *Child. Int'l,* 215 S.W.3d at 203.  And, "[u]nder [§] 408.020, prejudgment interest on liquidated claims is allowed only after the account holder demands payment."  *Id.* at 204.  "Awards of prejudgment interest are not discretionary; if [§ 408.020] applies, the court must award prejudgment interest."  *Id.* at 203.

### A. The State failed to preserve its argument regarding § 408.020.

EngagePoint contends the State failed to preserve its argument that damages were unliquidated because the State did not raise that argument in its motion for JNOV/new trial.  We agree.  "Complaints as to the allowance of interest, not raised in the motion for new trial, are not reviewable on appeal."  *Edgewater Heath Care, Inc. v. Health Sys. Mgmt., Inc.*, 752 S.W.2d 860, 869 (Mo. App. E.D. 1988); *see also* Rule 78.07(a).

---

[14] "The 'no' found in the phrase in the statute, 'when no other rate is agreed upon,' obviously refers to the lack of an agreement as to interest, not to an agreement to pay no or zero interest."  *Manfield v. Auditorium Bar & Grill, Inc.*, 965 S.W.2d 262, 269 (Mo. App. W.D. 1998).

[15] Contrary to the State's argument, the fact that the contract was for a firm and fixed price does not preclude recovery of prejudgment interest if the State later refused to pay that firm and fixed price or paid it late.  If the State were to pay the full contract price but long after it was due, the State would deprive EngagePoint of the time-value of money owed.

14

On occasion, courts have permitted appellate review of prejudgment interest in the *absence* of an after-trial motion. *See, e.g., Brown v. Donham*, 900 S.W.2d 630, 632 (Mo. banc 1995); *G&G Mech. Constructors, Inc. v. Jeff City Indus., Inc.*, 549 S.W.3d 492, 494-95 (Mo. App. W.D. 2018). But both *Brown* and *G&G* addressed situations where *no* after-trial motion was filed. Here, the State *did* file an after-trial motion that raised only one of the arguments it now wishes to pursue. As such, the State abandoned the ground not raised in its motion—its argument based on § 408.020—and may not pursue it further.[16] *See Hart v. City of Butler*, 393 S.W.2d 568, 576 (Mo. 1965) (refusing to review a contention not raised in the after-trial motion).

## B. The contract did not bar prejudgment interest.

"Determination of the right to prejudgment interest is reviewed de novo because it is primarily a question of statutory interpretation and its application to undisputed facts." *Child. Int'l*, 215 S.W.3d at 202. Likewise, "[c]ontract interpretation is a question of law,

---

[16] In response to EngagePoint's preservation challenge, the State points out that it filed a post-trial brief in which it argued that EngagePoint's damages were unliquidated and, therefore, not covered by § 408.020. And, although the State did not raise the issue again in its motion for JNOV/new trial, the State contends that it followed the procedure described in *Hawley v. Tseona*, 453 S.W.3d 837, 840 (Mo. App. W.D. 2014), so the issue was preserved. But the preservation issues raised in *Hawley* bear no resemblance to EngagePoint's challenge. In *Hawley*, the creditors first argued that the debtor waived any challenge to the award of prejudgment interest by voluntarily paying a portion of the overall award following entry of judgment but before post-trial motions had been ruled upon. *Id.* at 840-41. The creditors also argued that the debtor was barred from challenging the award because they failed to object to admission into evidence of the demand offers. *Id.* at 841. The court rejected both preservation arguments and considered the merits of debtor's claim regarding prejudgment interest. *Id.*

15

which [we] . . . review[] *de novo.*" *Am. Fed'n of State, Cnty. & Mun. Emps. v. State*, 653 S.W.3d 111, 127 (Mo. banc 2022).

In relevant part, § 4.3.1 of the contract stated, "All prices shall be as indicated on the Pricing Page. The [S]tate shall not pay nor be liable for any other additional costs including but not limited to taxes, shipping charges, insurance, *interest*, penalties, termination payments, attorney fees, liquidated damages, etc." (Emphasis added). According to the State, inclusion of "interest" on the list of costs the State would not incur precluded the award of prejudgment interest. And parties are free to agree that no prejudgment interest shall be available. *Manfield v. Auditorium Bar & Grill, Inc.*, 965 S.W.2d 262, 264, 269-70 (Mo. App. W.D. 1998) (reversing award of prejudgment interest when parties' agreement "provided for the payment of a zero percent interest rate" on defaulted promissory notes). The trial court rejected the State's argument, finding that § 4.3.1 "concerns only what costs [EngagePoint] w[as] permitted to pass on to [the State] and does not govern the availability or rate of prejudgment interest."

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *Am. Fed'n*, 653 S.W.3d at 127 (quoting *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973)). To determine the intent of the parties, we read the terms of contract "as a whole" and give them "their plain, ordinary, and usual meaning." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859 (Mo. banc 2006) (quoting *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)). "[T]he intent of the parties to a contract is expressed by the natural and ordinary meaning of the language referable to it." *Am.*

*Fed'n*, 653 S.W.3d at 127 (quoting *J.E. Hathman*, 491 S.W.2d at 264). In full, § 4.3.1 of

the contract provides,

> All prices shall be as indicated on the Pricing Page. The [S]tate shall not
> pay nor be liable for any other additional costs including but not limited to
> taxes, shipping charges, insurance, interest, penalties, termination
> payments, attorney fees, liquidated damages, etc. [EngagePoint] shall be
> paid installation costs and/or maintenance/repair costs provided that such
> costs are firm, fixed and specifically proposed in response to the Request
> for Proposal. Failure to propose costs for installation and
> maintenance/repair shall not relieve [EngagePoint] from [its] responsibility
> to maintain, install and/or repair all items, and any related costs for the
> service shall be considered by both [EngagePoint] and the [S]tate to be
> included within the price stated in the contract.

Read in context, § 4.3.1 neither barred prejudgment interest nor set an alternative interest

rate. In fact, § 4.3.1 did not speak to damages available in litigation at all. By contrast,

§§ 4.5 and 4.7 of the contract specifically address "damages" and "liability," but neither

of those provisions bars prejudgment interest or sets an alternate interest rate.

Instead, § 4.3.1 prohibited EngagePoint from increasing the contract price by

passing onto the State other "costs" EngagePoint might incur during performance of the

work—taxes, shipping charges, insurance, etc. Read in context, § 4.3.1's reference to

"interest" meant interest EngagePoint might have been charged by third parties

performing work for EngagePoint under the contract.[17] If EngagePoint had attempted to

pass these costs onto the State, § 4.3.1. would have excused the State from paying them.

---

[17] The same is true with respect to the references to "liquidated damages" and "attorneys' fees" in § 4.3.1. EngagePoint could have incurred "interest," "liquidated damages," and "attorneys' fees" in a dispute with a subcontractor and, but for § 4.3.1, attempted to pass those costs onto the State.

17

Thus, reading the reference to "interest" in the full context of § 4.3.1, we conclude that the reference does not preclude prejudgment interest when such interest is otherwise authorized by § 408.020. If the State and EngagePoint had agreed on a zero percent interest rate in the event of non-payment, they would have done so explicitly and clearly, as did the parties in *Manfield*. The State and EngagePoint did not do so.[18]

Point II is denied.

## III. The State failed to preserve its claim of instructional error related to its claim for breach of contract.

For its third point, the State argues that the trial court's jury instructions, which required the jury to find for EngagePoint if the cause of its breach was Curam's deficiencies, contradicted the contract's force majeure clause.[19] Specifically, the State claims that Jury instruction Nos. 19 and 20[20] did not accurately represent EngagePoint's

---

[18] In fact, when suing EngagePoint for breach of contract, the State sought prejudgment interest despite the reference to "interest" in § 4.3.1 of the contract.

[19] Point III states,

> The trial court erred in entering judgment for . . . EngagePoint on the State's breach of contract claim relating to Project I, because the jury instructions for that claim violated the limitations of the Force Majeure clause in the parties' contract, in that those instructions required the jury to excuse EngagePoint's breach if that breach was principally caused by deficiencies in Curam.

The contract's force majeure clause stated, in pertinent part:

> [neither] the [State] nor [EngagePoint] shall be liable to the other for any failure or delay of performance of any obligations hereunder when such failure or delay shall have been wholly or principally caused by acts or events beyond its reasonable control, including without limitation acts of God, acts of civil or military authority, fires, floods, earthquakes, or other natural disasters, war, riots or strikes.

[20] Instruction No. 19 sets out the elements the state must prove to support its breach of contract claim and directs the jury to find for the State if it proved each

contractual obligations and the consequences for EngagePoint in failing to meet those obligations because of problems with Curam. According to the State, the trial court's instructional error warranted reversal on the State's claim for breach of contract.

"Rule 70.03 provides, '[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." *Allen v. 32nd Jud. Cir.*, 638 S.W.3d 880, 890 n.12 (Mo. banc 2022) (quoting Rule 70.03). "The Rule further states, '[c]ounsel shall make specific objections to instructions considered erroneous.'" *Id.* (quoting Rule 70.03).

The State contends that it properly preserved Point III by raising the following objection during the instruction conference: "There was discussion of the force majeure provision existing. We don't think there is sufficient evidence to submit, especially on the third element, that EngagePoint provided written notice about these events. Again, I don't believe force majeure is a defense for impossibility." This objection, such as it is,

---

element "[u]nless you find that the State of Missouri is not entitled to recover by reason of Instruction Number 20."

    Instruction No. 20 provided,

> Your verdict must be for EngagePoint on the State's breach of contract claim if you believe:
>
> First, EngagePoint's failure or delay of performance under the agreement was wholly or principally caused by:
> *IBM's required update of Curam;
> *Curam's gaps in functionality at the system's "GO LIVE" Dates of October 1, 2013 and January 1, 2014, and
>
> Second, these were events beyond EngagePoint's reasonable control, and
>
> Third, EngagePoint provided the State written notice of such acts or events within a reasonable time of their occurrence.

did not give the trial court "a clear, distinct idea of the basis for the objection [or] the alternate language requested." *Allen*, 638 S.W.3d at 890 n.12. In particular, the objection at trial was based on sufficiency of the evidence to support the instruction and not on any contradiction between the instructions and the requirements of the force majeure provision, which is what the State argues on appeal. Thus, the objection was insufficient to preserve Point III for appellate review.[21]

Point III is denied.

---

[21] Even if the State's objection during the instruction conference were somehow sufficient to preserve Point III, the State failed to raise the issue again in its motion for JNOV/new trial. *See* Rule 70.03 ("The objections must also be raised in the motion for new trial in accordance with Rule 78.07."). The State's motion for JNOV/new trial argued:

> The Court should grant a new trial for the reason that it was error to not fully grant the State's Motion in Limine 16 and associated objections at trial allowing Plaintiff to elicit opinion evidence as to the feasibility of the timelines and instruct the jury as to both breach of contract based on a constructive change and waiver. Plaintiff attempts to use the feasibility of the timelines as well as their request, and the State's approval, to lengthen the time allowed to complete certain deliverables as both a sword and shield. Instruction 11 and 20. On one hand Plaintiff argued that it was impossible to use Curam because of its deficiency to complete the deliverable in the time allotted in the contract and therefore there was a breach of contract based on a constructive change. Instruction 11. However, since the State allowed [EngagePoint] to have a certain amount of additional time to complete the deliverables, [EngagePoint] could not have breached the contract since the State waived the first deadlines. Instruction 20. These are inconsistent theories and it was error to allow both.

Again, nothing in this paragraph speaks to the alleged inconsistencies between the escape from liability provision in Instruction Nos. 19 and 20 and the contract's force majeure clause.

**IV.    The trial court did not err in entering a directed verdict for EngagePoint on its claim for holdbacks.**

For its last point, the State challenges the trial court's entry of a directed verdict

for EngagePoint on its claims for holdbacks, arguing that the contract does not entitle

EngagePoint to hold back payments where EngagePoint failed to complete Project I.[22]

"In reviewing the grant of a motion for directed verdict, [we] 'must determine

whether the plaintiff made a submissible case.'"[23]  *Reed v. Curators of Univ. of Mo.*, 509

S.W.3d 816, 821 (Mo. App. W.D. 2016) (quoting *Dunn v. Enter. Rent-A-Car Co.*, 170

S.W.3d 1, 3 (Mo. App. E.D. 2005)).  "Whether the plaintiff made a submissible case is a

question of law subject to *de novo* review."  *Id.* (quoting *D.R. Sherry Const., Ltd. v. Am.*

*Family Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010)).

Two provisions of the contract are relevant here.  First, § 4.22.1(b), the holdback

provision, stated,

> Payment for Project I and Project II implementation/configuration/training
> project deliverables defined in Exhibit A, Pricing, shall be made in arrears.
> Upon acceptance of the individual deliverable by the [S]tate, the [S]tate
> agency shall withhold 10% [24] of all deliverable amounts due according to
> the contract pending final completion of the respective project.  Upon

---

[22] Point IV states,

The trial court erred in entering a directed verdict for . . . EngagePoint on
EngagePoint's claim for holdbacks, because that decision violated the terms
of the parties' contract regarding holdbacks and termination, in that those
terms do not entitle . . . EngagePoint to holdback payments when
EngagePoint failed to complete Project I.

[23] To determine whether plaintiff made a submissible case, we view the evidence
in the light most favorable to the plaintiff.  *Reed v. Curators of Univ. of Mo.*, 509 S.W.3d
816, 821 (Mo. App. W.D. 2016).  But, here, the trial court granted a directed verdict
based solely on a legal question—interpretation of the contract.

[24] This was later increased to 16 percent.

21

acceptance of the entire project by the state agency, the total amount withheld for the respective project shall be paid in entirety.

Second, § 4.8.1, the termination provision, provided,

The Division of Purchasing and Materials Management reserves the right to terminate the contract at any time, for the convenience of the State of Missouri, without penalty or recourse, by giving written notice to [EngagePoint] at least thirty (30) calendar days prior to the effective date of such termination. [EngagePoint] shall be entitled to receive compensation for services and/or supplies delivered to and accepted by the State of Missouri pursuant to the contract prior to the effective date of termination. [25]

On appeal, the State argues that, to give effect to § 4.22.1(b), EngagePoint's entitlement to holdbacks must turn on its successful completion of Project I, which did not occur before the State terminated the contract on May 18, 2015. And the State further claims that, to harmonize §§ 4.22.1(b) and 4.8.1, the reference to "compensation" in § 4.8.1 should be read as compensation "minus" holdbacks.

EngagePoint responds first by pointing out that the State did not actually terminate EngagePoint from MEDES, as distinct from terminating it as prime contractor. Rather, after "termination," the State amended the contract four more times and kept EngagePoint on as a subcontractor for more than three years until Project I was completed in 2018. EngagePoint further argues that there is no need to harmonize §§

---

[25] The State conceded that it terminated the contract for convenience. During its opening statement, the State said, "Division of Purchasing and [M]aterials [M]anager had the right to terminate the contract at any time for the convenience of the State of Missouri without penalty or recourse, [by] giving written notice to [EngagePoint] at least 30 days in advance. That is what the State did here." The trial court concluded that such a finding was supported by the State's own pleadings and admissions, as well as the evidence. The State does not appeal the court's finding that the State terminated the contract for convenience.

22

4.22.1(b) and 4.8.1 because the former governed holdback payments during the course of the contract and the latter governed termination for convenience even if it did not expressly address holdbacks.

The trial court concluded that "work was delivered and accepted by the State and as such [EngagePoint is] entitled to that payment at the termination of the contract." We agree.

The plain language of § 4.8.1 stated that, when the State terminates the contract for convenience, EngagePoint "shall be entitled to receive compensation for services and/or supplies delivered to and accepted by the State of Missouri pursuant to the contract prior to the effective date of termination." By definition, payments contemplated by § 4.22.1(b) were for work delivered to and accepted by the State. The purpose of that section was simply to incentivize EngagePoint to complete Project I by withholding a percentage of the total amount earned until project completion.

We disagree with the State that §§ 4.8.1 and 4.22.1(b) were in conflict and must be reconciled by reading "compensation" in § 4.8.1 to exclude holdbacks. Rather, the language of the contract supported EngagePoint's position that the two sections addressed different issues: § 4.8.1 addressed payments due to EngagePoint when the State terminated the contract for convenience while § 4.22.1(b) addressed holdbacks during the course of the contract. Section 4.8.1 did not address holdbacks, and § 4.22.1(b) did not address contract termination.

Moreover, allowing the State to retain the holdbacks simply by terminating the contract before completion of Project I would defeat the purpose of the holdbacks where

23

EngagePoint was unable to complete Project I as prime contractor and, thus, earn the holdbacks under § 4.22.1(b) for the very reason that the State terminated the contract for convenience. And retention of the holdbacks by the State would create a windfall for the State at the expense of EngagePoint for work it had actually completed.

Point IV is denied.

## Conclusion

The State failed to preserve its claim of error regarding the trial court's extra work/constructive change judgment and its claim of instructional error relating to the State's breach of contract claim. The trial court did not err in awarding prejudgment interest to EngagePoint or in directing a verdict for EngagePoint on its claims for holdbacks. The judgment of the trial court is affirmed.

_____

Karen King Mitchell, Judge

Anthony Rex Gabbert, Chief Judge, Presiding, Alisha D. O'Hara, Special Judge, concur.